## UNITED STATES DISTRICT COURT
## TRENTON DISTRICT OF NEW JERSEY

RACHEL ALINTOFF, individually and
as the parent, natural guardian and next
friend on behalf of H.A. and ALL
OTHERS SIMILARLY SITUATED,
Plaintiffs,

-against-

PAUL X. ESCANDON, individually and
as a STATE actor Judge for the
Monmouth County Superior Court;
BRYAN ALINTOFF; LINDA GRASSO
JONES, individually and as a STATE
actor Judge for the Monmouth County
Superior Court; LESLIE-ANN M.
JUSTUS, individually and as a STATE
actor Judge for the Monmouth County
Superior Court; LAWRENCE M.
LAWSON, individually and as a STATE
actor Judge for the Monmouth County
Superior Court; STUART RABNER,
individually and as a STATE actor Chief
Justice for the NJ Supreme Court;
GOVERNOR CHRIS CHRISTIE,
individually and as STATE actor
Governor of the STATE of New Jersey;
THE COUNTY OF MONMOUTH; THE
STATE OF NEW JERSEY;
MONMOUTH COUNTY SUPERIOR
COURT OF NEW JERSEY;
ADMINISTRATIVE OFFICE OF THE
COURTS (AOC); GLENN A. GRANT,
individually and as a STATE actor Judge
for the AOC; ADVISORY COMMITTEE
ON JUDICIAL CONDUCT (ACJC);
OFFICE OF THE ATTORNEY
GENERAL OF THE STATE OF NEW
JERSEY; DYFS n/k/a DCP&P;

RECEIVED

JAN 2 6 2015

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

CASE NUMBER:

**JURY DEMAND**

CIVIL COMPLAINT FOR
DAMAGES, INCLUDING
DECLARATORY AND
INJUNCTIVE RELIEF UNDER
18 USC 1961-1968; 42 USC 1983
and 1985; 18 USC 1951; 18 USC
371; 18 USC 2331, 2381, and 18
USC 2384

DR. PATRICIA BASZCZUK; TAMARA
SLOGOSKY; JENNA SHAPIRO, ESQ.;

1

LOMORRO LAW FIRM; ANDREA
BETH WHITE, ESQ.; SCOTT
ALINTOFF; JILL ALINTOFF; LARRY
ALINTOFF; ELIZABETH
BREDBENNER; ERIC DINOWITZ;
JESSICA RONAN; JEANNE
ASHMORE; ROSEMARY GABRIEL;
NJ BOARD OF EXAMINERS; DR.
MICHAEL WALKER; MARGARET
HARTMAN; ALLISON ACCURSO;
NICHOLETTE PEARSALL;
MONMOUTH COUNTY OFFICE OF
EDUCATION; JENNA NICOLE
SHAPIRO, ESQ; JOHN A. TONELLI;
LISA P. THORNTON; THERSA
ROMANO; NEW JERSEY BAR
ASSOCIATION; DEFENDANTS' RICO
ENTERPRISE(S), DOES,

Defendants.

Plaintiffs RACHEL ALINTOFF, H.A. and ALL OTHERS SIMILARLY SITUATED, complain as follows:

## INTRODUCTION

1.  Plaintiffs bring this action to vindicate their federal constitutional rights in the New Jersey State Courts.

2.  Plaintiffs bring this suit under U.S. Code Title 42 §§1983 and 1985; The Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S. Code §§1961-1968; The Hobbs Act, 18 U.S.C. § 1951; 18 USC § 371; 18 USC §§§ 2331, 2381, and 2384.

3.  Defendants are engaging in a pattern of racketeering activity and operating a cottage industry and Star Chamber for profit and sadism as RICO Enterprises; and seditious conspiracy to undermine and usurp the Federal government, through a calculated system of fraud, eugenics and social engineering; and dealing in obscene matters of human trafficking, child pornography and child prostitution, for motives both economic and non-economic, *National Organization for Women v. Scheidler*, 510 U.S. 249 (1994), as set forth by the averments stated herein.

4.  The Monmouth County Family Court is a court of limited jurisdiction and refuses to recognize and address its own constitutional violations.

5.  The Supremacy Clause provision in Article Six, Clause 2 of the United States Constitution establishes the United States Constitution, federal statutes, and treaties as "the supreme law of the land". It provides that these are the highest form of law in the United States legal system, and mandates that all state judges must follow federal law when a conflict arises between federal law and either a state constitution

2

or state law of any state. Human Rights Treaties - the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights are both rendered Supreme Law by virtue of the Supremacy Clause.

6.  States are prohibited to nullify federal law pursuant to Article III of the U.S. Constitution.

7.  Plaintiffs RACHEL ALINTOFF and H.A. are mother and child who for more than three (3) years and to this moment endure the abuse and cruel punishment by the state government actors and individuals named as Defendants herein who deliberately separated them from each other without a basis.

8.  The Family Court operates oftentimes to predetermine the "winner" without due process, which happened here. The Family Court operates on a "pay to play" level, promoting "conflict for cash" and engaging in extortion and blackmail.

9.  As a female litigant, Plaintiff RACHEL was and continues to be treated with contempt and retaliation by the Monmouth County Family Court, afforded no relief in enforcing her rights as a litigant because she is a woman and protective mother; and because she exercised her First Amendment right to expose a corrupt system of discrimination, civil rights violations, conspiracy, racketeering, influence, extortion and blackmail in the Monmouth County Family Court and the State of New Jersey.

10. Defendants colluded, conspired, schemed and falsified facts and law to benefit themselves financially, harass and oppress Plaintiffs, put children in crisis, inflict emotional distress upon Plaintiffs, and engage in Schadenfreude.

11. Defendants used retaliation, threats, and coercive control against Plaintiffs. Defendants deliberately acted obtuse to family violence, ignoring and minimizing it to subvert and circumvent established principles, codes, and laws on child abuse and domestic violence.

12. Defendants provoked family violence and labeled it "high conflict" in order to subject Plaintiffs to ongoing crisis and revictimization where they would require Defendants' "intervention," which translated into profit for them.

13. Defendants deliberately discourage prevention because it is not profitable for them.

14. Defendants perpetuated a cycle of psychological conditioning, eugenics, and social engineering here.

15. All Defendants who are mental health professionals and social workers are well-aware of the outcome of their intentional tortious actions; Harry Harlow's experiments on rhesus macaques and reports on his findings of the negative effects of maternal deprivation is standard learning for Psychology and Sociology education.

16. Defendants are knowingly doing damage to individuals and to society as a whole. Their actions cause depression, problems in interpersonal relationships, suicide, homicide, and many other inflictions and adverse outcomes that affect society and global commerce.

17. Defendants sought to benefit their agenda by promoting Richard Gardner's pro-pedophile, misogynistic, and unscientific theories of Parental Alienation Syndrome, which employs a "witch hunt" to pathologize female victims and marginalize

protective mothers in order to subvert, enable, and cover up child abuse; and terrorize, oppress, and humiliate women.

18. In actuality, Parental Alienation is an "end goal" rather than the cause and effect it purports to be. Its purpose is to alienate the mother and completely remove her from her children's lives, as she is a roadblock to those who seek to abuse her child; and to deprive children of their mother to the outcomes of Harry Harlow's studies as referenced above and the Center for Disease Control's study on Adverse Childhood Experiences (ACE study).

19. Defendants are aligned with Father's Rights groups a.k.a. the Men's Rights Movement, whose manifesto is distributed widely among the courts aimed to destroy women, overturn the 19th Amendment, resurrect Lord Hale's Law and the Rule of Thumb, hide income and assets, and avoid paying child support, without any concern for their children.

20. Father's Rights groups funnel and misappropriate Federal government funds to TANF to forward this Men's Rights agenda, employing methodologies concurrent with the 1991 book *Screw the Bitch: Divorce Tactics for Men* by Dick Hart and Sun Tzu's *The Art of War* as popularized by Gordon Gecko's "Greed is good" phraseology in the 1987 film *Wall Street*. This idolization has resulted in the degradation of human decency and phenomenal financial losses of those affected by Ponzi schemes and the like.

5

21. Furthermore, these family court players are linked to the banking industry and collude with the court system to defraud and cheat the American public out of their homes through predatory lending practices, which in turn affects global commerce.

22. Defendants purposely put family court litigants in untenable financial predicaments, which often result in bankruptcy and foreclosure, at which point Defendants scoop up short sales and foreclosures.

23. This is insider-trading so-to-speak, like a Ponzi scheme.

24. By crushing Women's Rights, Defendants are aimed at turning back the clock to the days when a woman could not vote, nor get approved for a mortgage, simply because she was a woman, and using her gender as an excuse to charge her higher interest rates and subject her to predatory lending practices.

25. Defendants' influence, corruption, and methods promote and enable child prostitution, child pornography, human trafficking, snuff films, and other dealings in obscene matter, to which Defendants appear to be linked and/or personally involved.

26. Numerous abductions and attempts connected to human trafficking have taken place in the State of New Jersey recently - there was a huge bust during the 2014 Superbowl and a huge bust of a child pornography ring in Bergen County.

27. There were several kidnapping attempts of young girls on Godwin Avenue in Ridgewood in the fall of 2013. The Oakland Journal reported:

*"The fourth attempted abduction of a child in Bergen County in the last two weeks occurred most recently in Hawthorne, NJ. Other towns with attempted abductions include Oradell, Maywood, and Hackensack.*

*In Hackensack, a man tried to get a young boy into his car under the guise of getting directions to Costco; in the Oradell and Maywood incidents involved young girls who were being lured, sometimes under the pretense of seeing puppies.*

*In Hawthorne, a 13-year-old was attending a soccer game at the rec fields when a man tried to pull her to a secluded parking area."*

28. In 2011, Allen and Overy partner and attorney Edward De Sear was found to have been operating a kiddie porn ring out of his home in Saddle River, NJ.

29. In 2010, Arnold & Porter partner and lawyer Joshua Gessler was found possessing and producing child pornography.

30. Child protective services such as DYFS n/k/a DCP&P are part of this ENTERPRISE and engage in a pattern of racketeering as they have sadistically terrorized parents, taken their children away without legitimate reason and unconscionably placed children in foster homes where the children were and continue to be sexually, physically, and psychologically abused even as one sits here reading this.

31. They have a financial incentive to do so, given that they receive funding from the government for every child they place.

7

32. Defendant DYFS n/k/a DCP&P was labeled a systemic failure several years ago and remains as such. Parents dealing with DCP&P often find themselves subject to a Kafkaesque existence where there is no transparency; they don't even know what they're being charged with, nor are they provided pertinent and concrete information per the Freedom of Information Act.

33. Defendant DYFS n/k/a DCP&P caseworkers are not only corrupt, but also incompetent; the State fails to train them adequately to protect children. Instead they employ threats and manipulation, which happened here. DCP&P discouraged prevention, failed to protect Plaintiffs and allowed abuse of Plaintiffs to fester, which has had an adverse cumulative effect on Plaintiffs' psyches, health, well-being, and childhood development.

34. By this method, DCP&P deliberately puts children at risk and subjects them to abuse which manifests in high rates of illegal drug abuse, alcoholism, teen pregnancies, suicide, and depression (ACE Study, Center for Disease Control).

35. New Jersey Child Advocate Kevin Ryan called DYFS n/k/a DCP&P, a "systemic failure" and "a debilitated agency that was in need of a complete overhaul."

36. Other states have had similar problems. In 2011, in the State of Georgia, Senator Nancy Schaefer, who had been exposing corruption in CPS, was suspiciously murdered, along with her husband and documentary filmmaker. Recently, in the State of Arizona, Governor Jan Brewer disbanded CPS altogether out of disgust.

37. The destruction of civil and constitutional rights by the Family Courts is inimical to society as a whole and the Defendants' actions are anti-American and therefore

8

treason. This destruction negatively impacted Plaintiffs' rights to acquire property and thrive in their business. Family Courts siphon their victims' funds and assets and are aligned with the banking industry; their influence and corruption has resulted in countless bankruptcies, foreclosures, loss of retirement savings, nest eggs, college funds, etc., which have attributed to the fall of the American economy.

38. By allowing Family Courts to run amok in a calculated anarchy, the government fails to act in the best interest of their constituents, administering to them the proverbial stab-in-the-back.

39. Defendants deliberately protracted this custody case for over three (3) years despite the NJ law mandating that the case end within six (6) months after the last responsive pleading, which was over 3 years ago or 1,080 days ago. Children grow fast; when trial courts do not act expeditiously as they are required and appellate courts are even slower, it presents a quagmire, a Catch-22.

40. When courts fail to act with integrity, it is foremost burdensome to the child and inimical to their development, health, and well-being. It is nothing short of child abuse, which happened here.

41. Relief from this Court is the last resort as relief in the State courts has proven futile. Those courts support Defendants' misconduct by providing false excuses in inconsistent and irrational decisions to protect Defendants in a court system known to be unjust rather than enforce basic civil rights.

42. State Appellate and Supreme Courts are duplicitous, as they essentially "rubber-stamp" the corruption in the lower courts. This occurs at the phenomenal and

irreparable emotional, financial, and constitutional expense and damage of Plaintiffs who lost over three (3) years of their mother-child relationship and phenomenal quality-of-life expense that can never be regained.

43. A custody battle is a form of domestic violence and Defendant BRYAN ALINTOFF started said litigation with malice to further abuse his former wife Plaintiff Rachel Alintoff and their child H.A., as ripping a child away from a mother who is their primary attachment figure is a form of child abuse as scientifically demonstrated and cautioned by the American Psychological Association, the Center for Disease Control, and the U.S. Dept. of Justice.

44. Moreover, Plaintiff H.A. is an autistic child and the Defendants have intentionally inflicted emotional distress upon the child, the ramifications of which are magnified.

45. H.A. has suffered tremendously as a result of the Defendants actions and inactions; and are in violation of the Americans with Disabilities Act (ADA).

46. It is imperative that a jury of the people hears this case.

47. It is imperative that the people of the United States be made aware of the corruption and moral turpitude running rampant in Family Court.

48. The interests of children should be of paramount importance, but have given way to an abomination of a cottage industry exploiting children for profit and bankrupting the American public.

49. It affects all of us because our civil and constitutional rights as a whole are being destroyed. It is happening in family courts across America, the implications of which are pivotal to the future of this country. Family Court is employing eugenics

10

and social engineering, marginalizing mothers and psychologically conditioning and corrupting American youth.

50. Family Court has become an atrocity and it is unthinkable, yet an absurd fact that it is self-policing. Put best by the Roman poet Juvenal, "Sed quis custodiet ipsos custodes?" *(Satire VI, lines 347–8)* or in English, "Who will guard the guards themselves?"

## JURISDICTION AND VENUE

51. Jurisdiction is conferred on this Court by 28 U.S.C. §1332; §1341; §1343(3) and (4); and §1346, which provide for original jurisdiction pursuant to 42 U.S.C. §§1983 and 1985 and 28 U.S.C. §1331 to redress federal constitutional violations and conspiracy under color of STATE law; and 42 U.S.C. §§1983 and 1985 civil rights violations and conspiracy; 18 U.S.C. §1961-1968 to redress racketeering, influence, and corruption; The Hobbs Act, 18 U.S.C. § 1951; 18 USC § 371; 18 USC §§§ 2331, 2381, and 2384.

52. Venue is proper in the Trenton District of New Jersey pursuant to 28 U.S.C. §1391(b) and 18 U.S.C. §1965 et seq. because the events giving rise to this action occurred within the Trenton District.

53. However, this case along with a similar case for which the Plaintiffs hereby request joinder pursuant to Rule 1407, Karin Wolf's case before the U.S. District Court, Newark District, case no. 14-cv-5985, Wolf v. Escala, et al., are so complex and that it raises questions as to whether or not they should be heard within the geographical parameters of State of New Jersey at all.

54. The Defendants are so incestuous and the possibilities for conflicts of interests are of such magnitude that it unclear as to whether or not anyone in New Jersey doesn't have an interest in this case or Karin Wolf's case.

55. This is a matter of public interest and has the makings of a civil war.

56. Federal Question Jurisdiction is proper as Plaintiffs raise Federal questions herein.

57. Diversity Jurisdiction is proper since the amount in question exceeds $75,000 and Plaintiff RACHEL ALINTOFF is a citizen of the State of New York.

58. Plaintiff H.A. currently resides in the State of New Jersey however, it is under fraud and color of law at the hands of the Defendants.

59. Throughout the litigation, Plaintiff RACHEL was treated with malice, contempt, and bias by Defendant STATE and was punished because she moved out of the State of New Jersey back to her home state New York, which speaks directly to why Diversity Jurisdiction is made available.

60. This was a violation of her Right to Freedom of Movement pursuant to the Privileges and Immunities Clause of the U.S. Constitution, Article IV, Section 2, Clause 1.

61. Declaratory relief is available pursuant to 28 U.S.C. §§2201 and 2202.

62. Civil remedies and treble damages are available pursuant to 18 U.S.C. § 1964.

63. Plaintiff RACHEL is part of the New Jersey Coalition for Family Court Reform and is dedicated to upholding and establishing civil rights and eliminating racketeering activity through functioning as a private attorney general, *Rotella v. Wood*, et al.,

12

certiorari to the United States Court of Appeals for the Fifth Circuit, No. 98-896.

Argued November 3, 1999--Decided February 23, 2000.

## PARTIES

64. Plaintiff Rachel Alintoff (RACHEL) is an individual and resident of the State of New York, domiciled in Kings County, and natural mother of Plaintiff H.A. (H.A.). Plaintiff RACHEL has been a resident of the State of New York, domiciled in New York City, during the course of the events detailed herein, which gave rise to this action.

65. Plaintiff H.A. (H.A.) is an individual and resident of the State of New York, domiciled in Monmouth County at present, and natural son of Plaintiff RACHEL.

66. Plaintiffs ALL OTHERS SIMILARLY SITUATED (AOSS), are, but not limited to, mothers and children experiencing the same and/or similar violations in their family court cases, particularly involving child custody, divorce, and dealings with child protective services such as DCP&P.

67. Defendant STATE OF NEW JERSEY is at all times herein, a government entity created and authorized under the laws of the State of New Jersey and the United States of America.

68. At all times relevant herein, Defendant STATE OF NEW JERSEY employed and/or administered salaries, retirement pensions, funding and/or other monies to Defendants named herein as State actors.

69. Defendant STATE OF NEW JERSEY is responsible for policies and customs; and operated as a government entity acting under the color of laws, statutes, ordinances, regulations, policies, customs, and usages of the State of New Jersey.

70. Defendant Bryan Alintoff (BRYAN ALINTOFF) is an individual and resident of the State of New Jersey, domiciled in Monmouth County, and natural father of Plaintiff H.A..

71. Defendant Judge Paul X. Escandon (ESCANDON) is an individual and Judge for the Monmouth County Court, in the State of New Jersey, and acted towards Plaintiffs under color of statutes, ordinances, customs, and usage of the State of New Jersey; and acted within the scope of his employment except when alleged herein that he acted beyond the scope. He is sued in his individual and official capacities.

72. Defendant Chief Justice Stuart Rabner (RABNER) is an individual and Judge for the Supreme Court, State of New Jersey, and acted towards Plaintiffs under color of statutes, ordinances, customs, and usage of the State of New Jersey and acted within the scope of his employment except when alleged herein that he acted beyond the scope. He is sued in his individual and official capacities.

73. Defendant Governor Chris Christie (CHRISTIE) is an individual and Governor of the State of New Jersey. He is a resident of the State of New Jersey and domiciled there. He is sued herein in his individual, personal, and official capacities. He is responsible for the conduct of the STATE actors named herein, has failed to act, and has acted towards Plaintiffs under color of statutes, ordinances, customs, and usage

14

of the State of New Jersey and acted within the scope of his employment except when alleged herein that he acted beyond the scope. He is sued in his individual and official capacities.

74. Defendant KIM GUADAGNO, individually and as STATE actor Lt. Governor and Secretary of State of the State of New Jersey.

75. Defendant MICHAEL GUADAGNO, individually and as a State actor Judge for the Superior Court, Appellate Division, Family Part.

76. Defendant Linda Grasso Jones (GRASSO JONES) is an individual and Judge for the Monmouth County Court, in the State of New Jersey, and acted towards Plaintiffs under color of statutes, ordinances, customs, and usage of the State of New Jersey; and acted within the scope of her employment except when alleged herein that she acted beyond the scope. She is sued in her individual and official capacities.

77. Defendant Leslie-Ann M. Justus (JUSTUS) is an individual and Judge for the Monmouth County Court, in the State of New Jersey, and acted towards Plaintiffs under color of statutes, ordinances, customs, and usage of the State of New Jersey; and acted within the scope of her employment except when alleged herein that she acted beyond the scope. She is sued in her individual and official capacities.

78. Defendant Lawrence M. Lawson (LAWSON) is an individual and Judge for the Monmouth County Court, in the State of New Jersey, and acted towards Plaintiffs under color of statutes, ordinances, customs, and usage of the State of New Jersey;

and acted within the scope of his employment except when alleged herein that he acted beyond the scope. He is sued in his individual and official capacities.

79. Defendant THE STATE OF NEW JERSEY is a state of the United States of America.

80. Defendant County of Monmouth (MONMOUTH COUNTY) is a county in the State of New Jersey.

81. Defendant Monmouth County Superior Court of New Jersey (MONMOUTH COUNTY COURT) is an entity located at 71 Monument Park, Freehold NJ, 07728.

82. Defendant Administrative Office of the Courts (AOC) was and is at all times herein a government entity created and authorized under the laws of the State of New Jersey. It is located at 25 Market Street, Trenton, NJ 08611. Its purpose is to improve the administration of justice in New Jersey and help manage the State's courts. It is operated as a government entity acting under the color of laws, statutes, ordinances, regulations, policies, customs, and usages of the state of New Jersey. It is sued as such and when alleged herein that it acted beyond the scope of its responsibilities and/or failed to act pursuant to its responsibilities.

83. Defendant GLENN A. GRANT is an individual and Judge overseeing the Administrative Office of the Courts (AOC) in the State of New Jersey and acted towards Plaintiffs under color of statutes, ordinances, customs, and usage of the State of New Jersey; and acted within the scope of his employment except when alleged herein that he acted beyond the scope. He is sued in his individual and official capacities.

16

84. Defendant Advisory Committee on Judicial Conduct (ACJC) was and is at all times herein a government entity created and authorized under the laws of the State of New Jersey. It is responsible to uphold ethics, address violations of judicial ethics and judicial canons, and infringement of policies and customs. It is operated as a government entity acting under the color of laws, statutes, ordinances, regulations, policies, customs, and usages of the state of New Jersey. It is sued as such and when alleged herein that it acted beyond the scope of its responsibilities and/or failed to act pursuant to its responsibilities.

85. Defendant Tamara Slogosky (TAMARA SLOGOSKY) is an individual and resident of the State of New Jersey. She is a New Jersey State licensed attorney-in-waiting and law clerk to Defendant ESCANDON. As such, she is responsible for carrying out administrative functions. She acted towards Plaintiffs under color of statutes, ordinances, customs, and usage of the State of New Jersey and attorney ethics as set forth by the American Bar Association; and acted within the scope of her employment except when alleged herein that she acted beyond the scope. She is sued in her individual and official capacities.

86. Defendant Allison Accurso (ALLISON ACCURSO) is an individual and resident of the State of New Jersey. At all times relevant herein, she is a New Jersey State licensed attorney-in-waiting and law clerk to Defendant GRASSO JONES. As such, she is responsible for carrying out administrative functions. She acted towards Plaintiffs under color of statutes, ordinances, customs, and usage of the State of New Jersey and attorney ethics as set forth by the American Bar Association; and

17

acted within the scope of her employment except when alleged herein that she acted beyond the scope. She is sued in her individual and official capacities.

87. Defendant Jenna Shapiro, Esq. (JENNA SHAPIRO) is an individual and resident of the State of New Jersey. She is a New Jersey State licensed attorney conducting substantial business in this District from offices located at Wilentz, Goldman & Spitzer P.A., 90 Woodbridge Center Drive Suite 900, Box 10, Woodbridge, NJ 07095. She was employed at Lomurro, Davison, Eastman & Muñoz, P.A. during the events that gave rise to this action as detailed herein. She acted towards Plaintiffs under color of statutes, ordinances, customs, and usage of the State of New Jersey and attorney ethics as set forth by the American Bar Association; and acted within the scope of her employment except when alleged herein that she acted beyond the scope. She is sued in her individual and official capacities.

88. Defendant Andrea Beth White, Esq. (ANDREA BETH WHITE) is an individual and resident of the State of New Jersey. She is a New Jersey State licensed attorney conducting substantial business in this District from offices located at Tonneman, Vuotto, Enis, & White, LLC, 14 Cliffwood Avenue, Suite 100, Matawan, NJ 07747. She was employed at Lomurro, Davison, Eastman & Muñoz, P.A. during the events that gave rise to this action as detailed herein. She is the Immediate Past Chair of the New Jersey State Bar Association, Family Law Executive Committee. She acted towards Plaintiffs under color of statutes, ordinances, customs, and usage of the State of New Jersey and attorney ethics as set forth by the American Bar Association; and acted within the scope of her employment except when alleged

18

herein that she acted beyond the scope. She is sued in her individual and official capacities.

89. Defendant Lomurro, Davison, Eastman & Muñoz, P.A. (LOMURRO LAW FIRM) was and is at all times herein a corporate entity created and authorized under the laws of the State of New Jersey. It employs New Jersey State licensed attorneys, conducting substantial business in this District from offices located at 100 Willow Brook Road, Freehold, NJ 07728. It acted towards Plaintiffs under color of statutes, ordinances, customs, and usage of the State of New Jersey and attorney ethics as set forth by the American Bar Association; and acted within the scope of its official capacities except when alleged herein that it acted beyond its scope.

90. Defendant Scott Alintoff (SCOTT ALINTOFF) is an individual and resident of the State of New Jersey. He is the brother of Defendant BRYAN ALINTOFF

91. Defendant Jill Alintoff (JILL ALINTOFF) is an individual and resident of the State of New Jersey. She is the sister-in-law of Defendant BRYAN ALINTOFF

92. Defendant Larry Alintoff (LARRY ALINTOFF) is an individual and resident of the State of Florida. He is the brother of Defendant BRYAN ALINTOFF. He is a financial backer of Defendant BRYAN ALINTOFF.

93. Defendant Elizabeth Bredbenner (ELIZABETH BREDBENNER) is an individual and resident of the State of New Jersey. She is the girlfriend of Defendant BRYAN ALINTOFF.

94. Defendant Eric Dinowitz (ERIC DINOWITZ) is an individual and resident of the State of New Jersey. He was and is believed to still be a financial backer of Defendant BRYAN ALINTOFF.

95. Defendant Jessica Ronan (JESSICA RONAN) is an individual and resident of the State of New Jersey. She is a New Jersey State licensed social worker. At all times relevant herein, she is employed by Defendant DYFS n/k/a DCP&P. She is obligated to protect children and advocate for them. At all times relevant herein, she is obligated to act consistent with her training and pursuant to social worker ethics. She is sued in her official capacity and individually when alleged herein that she acted beyond the scope of her duties as a social worker representing DCP&P and the STATE.

96. Defendant Jeanne Ashmore (JEANNE ASHMORE) is an individual and resident of the State of New Jersey. She is the Director of Community and Constituent Relations at the Offices of Defendant Governor Chris Christie. She is sued in her official capacity and individually when alleged herein that she acted beyond the scope of her administrative duties representing the STATE.

97. Defendant Rosemarie Marinan-Gabriel (ROSEMARIE MARINAN-GABRIEL) is an individual and resident of the State of New Jersey. She is the Family Division Manager of the Monmouth County Family Court. At all times relevant herein, she is obligated to act consistent with her training and pursuant to ethics, laws, statutes, ordinances, regulations, policies, customs, and usages of the state of New Jersey.

She is sued individually when alleged herein that she acted beyond the scope of her duties as Manager and in her official capacity as an appointee of Defendants.

98. Defendant New Jersey Board of Examiners (NJBOE) is part of the Division of Consumer Affairs. It licenses and regulates psychologists in New Jersey and has offices located at 124 Halsey Street, Newark, New Jersey 07102. At all times relevant herein, it is obligated to act consistent with its purpose and pursuant to mental health professional ethics. It is sued in its official capacity and individually when alleged herein that it acted beyond the scope of its duties as a regulatory entity of the STATE.

99. Defendant Dr. Michael Walker (DR. MICHAEL WALKER) is an individual and resident of the State of New Jersey. He is the Executive Director of Defendant NJ BOARD OF EXAMINERS. At all times relevant herein, he is obligated to act consistent with his training and pursuant to mental health professional ethics. He is sued in his official capacity and individually when alleged herein that he acted beyond the scope of his duties as a mental health professional representing the STATE.

100. Defendant Dr. Patricia Baszczuk (DR. BASZCZUK) is an individual and resident of the State of New Jersey. She is a New Jersey State licensed social worker and custody evaluator conducting substantial business in this District, with offices located at 107 W. 2nd Street, Suite 7, Howell, NJ 07731. She is contracted to conduct custody evaluations and obligated to represent children's best interests. She was recently hired by DCP&P. At all times relevant herein, she is obligated to act

21

consistent with her training and pursuant to social worker ethics. She is sued individually when alleged herein that she acted beyond the scope of her duties as a forensic evaluator and in her official capacity as an appointee of Defendants.

101. Defendant Division of Youth and Family Services now known as Division of Child Protection and Permanency (DYFS n/k/a DCP&P) is an organization that was and is at all times relevant herein a government entity. It was and is at all times relevant herein obligated to act consistent with ethical standards, policies and customs and operated as a governmental entity acting under the color of laws, statutes, ordinances, regulations, policies, customs, and usages of the state of New Jersey. Defendant DYFS n/k/a DCP&P is sued when alleged herein that it acted beyond the scope of its duties and in its official capacity as an appointee of Defendant STATE.

102. Defendant Jessica Ronan (RONAN) is an individual, a resident of the State of New Jersey, and a social worker for DCP&P. At all times relevant herein, she is obligated to act consistent with her training and pursuant to social worker ethics, as well as laws, statutes, ordinances, regulations, policies, customs, and usages of the state of New Jersey. She is sued individually when alleged herein that she acted beyond the scope of her duties as social worker and in her official capacity as an employee of Defendants DYFS n/k/a DCP&P and the STATE.

103. Defendant Advisory Committee on Judicial Conduct (ACJC) was and is at all times herein a government entity created and authorized under the laws of the State of New Jersey. It is responsible to uphold ethics, address violations of judicial ethics and judicial canons, and infringement of policies and customs. It is operated as a

governmental entity acting under the color of laws, statutes, ordinances, regulations, policies, customs, and usages of the state of New Jersey. It is sued as such and when alleged herein that it acted beyond the scope of its responsibilities and/or failed to act pursuant to its responsibilities.

104. Defendant Office of the Attorney General of the State of New Jersey (OAG) was and is at all times herein a government entity created and authorized under the laws of the State of New Jersey. It is responsible to uphold civil rights and ethics; and address violations and infringement of policies and customs. It is operated as a government entity acting under the color of laws, statutes, ordinances, regulations, policies, customs, and usages of the state of New Jersey. It is sued as such and when alleged herein that it acted beyond the scope of its responsibilities and/or failed to act pursuant to its responsibilities.

105. Defendant Nicholette Pearsall (NICHOLETTE PEARSALL) is an individual and resident of the State of New Jersey. She is the a social worker for the Long Branch School District and JMF Early Childhood Learning Center in Long Branch, NJ.

106. Defendant Monmouth County Office of Education (MCOE) is an entity located at 4000 Kozloski Road, Freehold, NJ 07728.

107. Defendant DOES are policymaking officials of Defendant STATE who are as responsible as the other named Defendants in this action and who knew of and ignored the constitutional violations in this case and in other cases which they have for years reinforced a custom and policy in the Family Court of ignoring litigants'

due process rights. Plaintiffs reserve the right to amend this Complaint after discovery reveals the true names of DOES.

108. Defendant DOES are also other individuals, officials, and entities who are as responsible as the other named Defendants in this action. Plaintiffs reserve the right to amend this Complaint after discovery reveals the true names of DOES.

109. Plaintiffs reserve the right to amend this Complaint and add plaintiffs and Defendants after Discovery reveals further information and/or as Plaintiff RACHEL is able to secure legal representation for herself and her minor child.

110. Plaintiffs also reserve the right to amend this complaint for any errors and/or deficiencies as Plaintiffs are unrepresented and filing in *propria persona.*

111. Upon learning the true names and capacities of the DOES Defendants, Plaintiffs will amend this complaint as appropriate.

112. Plaintiffs are informed, believe and allege that at all times mentioned each Defendant was the agent, associate, affiliate, co-conspirator, superior, and /or employee of each other Defendant and was acting within the course, scope, and purpose of such relationship in each ascribes of them herein, except as otherwise alleged.

113. At all times set forth by the averments herein and henceforth where Plaintiffs allege that any Defendant has perpetuated and/or continues to perpetuate a pattern of collusion, conspiracy, scheming, fraud, extortion, witness tampering, retaliation, abuse, harassment, tortious interference, tortious acts, intentional infliction of emotional distress, personal injury, kidnapping, false imprisonment, obstruction of

justice, constitutional violations, ethical violations, violations of public policy and codes of conduct, indecency, engaged in or aided and abetted a pattern of racketeering activity, engaged in a RICO ENTERPRISE in violation of federal law, and/or otherwise committed a violation of law, either statutory or common, federal or state, it shall constitute a **predicate act** in each instance pursuant to 18 U.S.C. 1961 and define state actors as having acted beyond the scope of their employment and official capacity, for personal gain or pleasure, and acted beyond the scope of their responsibilities and/or failed to act pursuant to their responsibilities. This shall also mean Defendants are acting outside of judicial immunity as they stepped outside of that immunity once they commingled their official capacities with personal interests, for personal gain.

## FACTS AND PROCEDURAL HISTORY OF PLAINTIFFS' CUSTODY CASE - STATEMENT OF FACTS

114. On September 28, 2011, Plaintiff RACHEL ALINTOFF and Defendant BRYAN ALINTOFF entered into a Consent Order for custody of their minor child H.A., stating the following: "The parties shall have joint legal and joint physical custody of the minor child, H.A. Max Alintoff."

115. This Consent Order was not given full faith and credit by the Defendants named herein.

116. Defendants embarked on what would become an abusive racket fraught with fraud, collusion, and extortion for several years to come, continuing to present day.

117. Defendants proceeded to conduct a cottage industry and Star Chamber for profit and sadism as RICO Enterprises; and seditious conspiracy to undermine and usurp the Federal government.

## JUDGE PAUL X. ESCANDON

118. Defendant Judge ESCANDON terminated Plaintiff RACHEL's parental rights without due process of law in October 2011. He failed to give Plaintiff a hearing and failed to set a time to revisit the ruling, as required by law.

119. Moreover, Defendant ESCANDON on the bench lied stating that the hearing was not required even though the regulations state that custody cannot be changed without a hearing.

120. Plaintiff RACHEL was able to get her child back through an emergent appeal. However, Plaintiff RACHEL's due process rights were violated again several years later by Defendant Linda GRASSO-JONES at the Monmouth County Family Court.

121. Defendants colluded and conspired to hide Defendant BRYAN ALINTOFF's income and assets to put Plaintiffs in an untenable financial predicament, which put Plaintiff RACHEL and her son H.A. below the federal poverty line, despite the fact that Defendant BRYAN ALINTOFF earned on average over $500,000/yr.

122. Defendants deliberately put RACHEL in an untenable legal predicament as well.

123. Over the course of a year from 2012 until 2013, Plaintiff RACHEL spoke with a Federal Agent at the Red Bank NJ FBI office about Judge Paul Escandon and his court dealings within Monmouth County Courthouse.

124. After posting on Craigslist and social media, Plaintiff RACHEL discovered that there were dozens of other women who had also been denied their due process rights by Judge Paul Escandon. The similarities between these women were that in all cases, the male litigant made a significant high income – six figures and up.

125. The FBI told Plaintiff RACHEL that it begins to look at the Assignment Judge when a high percentage of cases with wealthy litigants continuously go in front of the same Judge over and over again.

126. In this case, Judge Lawrence Lawson was assigning cases to Judge Paul Escandon that were highly contested custody cases where the husband was the main income for the family and where the mother was always the primary care taker.

127. It is important to note that two years into Plaintiff RACHEL's divorce proceedings in Monmouth County Courthouse and her ongoing pleas for help with The State Attorney General, Jeanne Ashmore, Governor Christie and the ACJC, Plaintiff RACHEL requested all of Judge Paul Escandon's final divorce and custody rulings from the first two years that he was on the bench

128. This request was in writing to Rosemary Gabriel, Family Division Manager of Monmouth County Courthouse.

129. Plaintiff RACHEL received a response letter shortly after her request, stating that she could have the records (which are public and cannot be denied to anyone who asks for them), but that the court will accommodate her request over the course of three years.

130. On the New Jersey Judiciary website under court records requests it reads as follows:

> *"The availability of resources and the potential for disruption of court operations are considerations in determining how quickly Judiciary staff can respond to record requests, especially when records are stored off-site. If a record request is voluminous or for other reasons cannot be completed within the normal timeframe, or if a request is for certain documents on an ongoing basis (e.g., all complaints filed in the civil division each week), it shall be referred to the appropriate division manager or municipal court administrator. The division manager or municipal court administrator shall assess the request and together with the requestor craft a reasonable solution that meets both the public's need for access and the Judiciary's need for efficient court operations."*

131. It is egregious for the court to think that three years is "a reasonable solution that meets both the public's need for access and the Judiciary's need for efficient court operations."

132. In this case, the three year projection for getting Plaintiff RACHEL the public court records she requested was a deliberate way for the court administration, Judge Paul Escandon, Rosemary Gabriel, Judge Lawrence Lawson and Lomurro, Davison, Eastman and Munoz, PA to protect Monmouth County Court's own interests and the "players" who make money off of the unethical and illegal rulings of Judge Paul Escandon and other judges within the courthouse.

133. Family cases are not closed records. The court retaliated against Plaintiff RACHEL for asking for these records. In order to show a pattern by Judge Paul Escandon, these records were imperative to obtain.

134. Plaintiff RACHEL was forced to hire a Civil Rights Attorney, Robert Tandy, Esq. in order to obtain Judge Escandon's records in a reasonable time frame. The court administration came back with a "three-month time frame" once Robert Tandy contacted the Hall of Records on Plaintiff RACHEL's behalf.

135. This is proof that the copies themselves were not overly burdensome to Monmouth Courthouse, but that the actual request by Plaintiff RACHEL for these records were circumspect.

136. The court knew the records would implicate Judge Escandon, Judge Lawson and others in their courthouse, and thus lead them to essentially block Plaintiff RACHEL from receiving them in a timely manner. This is collusion and conspiracy to obstruct evidence.

137. Moreover, when Robert Tandy and Plaintiff were given Judge Escandon's records to review, all cases where Defendant Lomurro, Davison, Eastman and Munoz, PA had gone before Judge Escandon were removed from the files by the courthouse.

138. Robert Tandy and Plaintiff RACHEL were personally aware of dozens of unsealed open-public courtroom family divorce cases in front of Judge Escandon, where Defendant LOMURRO LAW FIRM represented male litigants. These files were deliberately hidden from Robert Tandy and Plaintiff RACHEL's view.

139. From the moment Plaintiff RACHEL went before Defendant ESCANDON, he made adverse "findings" as to Plaintiff RACHEL's credibility, motives, and likelihood to comply with court orders.

140. He used those "findings" to overturn a Consent Order that Plaintiff RACHEL and her husband, Bryan Alintoff, had entered into after lengthy negotiations.

141. That Consent Order had contained an agreement for joint legal and physical custody, as well as arrangements for parenting time.

142. The judge stripped Plaintiff RACHEL of her joint custody rights and gave sole custody to Defendant BRYAN ALINTOFF, while also giving him effective veto power over Plaintiff RACHEL's parenting time.

143. In erasing these aspects of the Consent Order, the judge violated several constitutional Rights of both Plaintiff RACHEL and H.A..

144. Judges Parrillo and Judge Grall granted leave to Plaintiff RACHEL's appeal and summarily reversed Judge Escandon's decision.

145. On remand, Judge Escandon continued to rule against Plaintiff RACHEL on every important issue, including pendente lite support and attorneys' and experts' fees. Again, his rulings were consistently without substantive or procedural support and were contrary to law.

### Plaintiff  Rachel Alintoff's attempted to remedy the problem

146. There are several agencies and entities across federal, state, and local governments that are responsible for investigating and prosecuting misconduct. Plaintiff

RACHEL contacted The Executive Branch including, but not limited to: Federal employees, The Office of Professional Responsibility, and Assistant U.S. Attorneys.

147. Within the Judicial Branch, Plaintiff RACHEL contacted: every Senator in the State of New Jersey, the Office of Congressional Ethics and House Committee on Ethics.

148. Within the State and Local Governments, Plaintiff RACHEL contacted a list of State Ethics Oversight Agencies, ACJC and administrative persons within Monmouth County Courthouse as well as Rosemary Gabriel and Theresa Romano.

149. Plaintiff RACHEL helped organize protests in front of Monmouth County Courthouse, posted information on Craigslist looking for other mothers who had illegally lost custody of their children and readily spoke to the media and press about the corruption she had witnessed first-hand within her own case and with other cases for which she had obtained the records.

150. Defendant Judge JUSTUS threatened Plaintiff RACHEL with sanctions if she did not answer questions posed to her by Jenna Shapiro during Discovery about what was posted online about Judge Escandon. This implies that Jenna Shapiro was acting as counsel to Judge Escandon and gave the appearance of impropriety.

151. By Plaintiff RACHEL exercising her Freedom of Speech, she was retaliated against within the courthouse. It is clear that no "objectively reasonable" observer could conclude that Judge Escandon was impartial in Plaintiff RACHEL's case.

152. For all of these reasons, Plaintiff RACHEL asked that Judge Escandon recuse himself from her case. When he refused, Plaintiff RACHEL went up to appeals asking that they remand the matter for handling by a different judge.

153. Judge Escandon refused to recuse himself and was inexplicably relocated within the courthouse approximately six weeks later. It was not typical rotation time, which speaks to the motive.

154. Defendant ESCANDON engaged in judicial misconduct, misrepresentation, racketeering, collusion, fraud, and prejudicial collusion with Defendant LOMURRO LAW FIRM.

155. Judge Escandon disallowed evidence that clearly showed proof in Plaintiff RACHEL's favor.

156. In collusion with Judge Paul Escandon, divorce attorneys Defendants ANDREA BETH WHITE, ESQ. and JENNA SHAPIRO, ESQ. engaged in threats to Plaintiff RACHEL, abuse of process, wrongful use of civil proceedings, and influencing several witnesses by fraud.

157. Defendants usurped control of Plaintiff RACHEL's right to assert her guaranteed rights, *i.e.*, they are no longer inalienable as guaranteed in the Constitution.

158. Effectively, the judges listed above dispensed Plaintiffs' rights at their whim and pleasure with total impunity.

159. Unfortunately, ordinary citizens have no other means to enjoy or enforce their civil rights except through that same court system. What this means is that without a mechanism for remedy, (the court) these litigants have no rights.

160. This type of abuse is exactly why our forefathers granted ordinary citizens the right to access the Grand Jury **directly**. It is a centuries old system of checks and balances imported from England, installed in America to protect ordinary citizens against

judicial tyranny. There is no jury afforded to litigants in Family Court. This must change.

161. Title 18 USC § 242 provides that judges are liable for criminal acts committed under "color of law" meaning that judges may be immune from prosecution for civil misbehavior, but they are not immune from prosecution for criminal behavior.

162. Judge Escandon is biased and prejudiced against Plaintiff RACHEL ALINTOFF based upon: (a) the Appellate Division's reversal of Judge Escandon's custody ruling (and ultimate remand); (b) Judge Escandon's pendente lite ruling which left Plaintiff RACHEL unable to support herself without the assistance of her family; (c) Judge Escandon's service of the pendente lite Order upon Plaintiff's counsel only, which sabotaged her first meeting with custody evaluator, Defendant DR. BASZCZUK; and (4) Plaintiff RACHEL's filing of a complaint to the Ombudsman, Defendant TERESA ROMANO, against Defendant ESCANDON.

## DR. PATRICIA BASZCZUK

163. Defendant DR. BASZCZUK has at least four (4) counts of ethics violations against her for which she has pled guilty to in the State of New Jersey.

164. At no time did Defendant DR. BASZCZUK disclose these ethics charges against her to Plaintiff RACHEL.

165. What is even more disturbing is that Dr. Baszczuk is now employed by DCP&P to perform child custody evaluations, despite these ethic charges.

166. All of the guidelines for doing child custody evaluations repeatedly emphasize that the evaluator must be unbiased and not favor one party over another.

33

167. Doctor Patricia Baszczuk works almost exclusively for Defendant BRYAN ALINTOFF's law firm, Lomurro, Davison, Eastman and Munoz, PA. This is a violation of ethics and speaks to collusion and Honest Services Fraud, with her as a preferred vendor.

168. "Mixed loyalties" as described by The National Register of Health Service Psychologists, warn custody evaluators to "avoid repeatedly conducting child custody evaluations for only one law firm."

169. Defendant DR. BASZCZUK failed to disclose her close relationship with Defendant LOMURRO LAW FIRM to both Plaintiff RACHEL and her attorney, which is an ethics violation with the New Jersey State Board of Psychological Examiners.

170. At trial, Defendant DR. BASZCZUK attempted to sidestep the question of how many litigants from Lomurro she was assigned per year.

171. Working with Lomurro law firm to create "favorable" outcomes for the firm's male litigants is collusion and conspiracy.

172. In Defendant DR. BASZCZUK's final custody report, she systematically misquoted, misrepresented, and falsified statements; and did not consider "the best interest of the child" because she deliberately refused to consult with H.A.'s primary care physician and did not consult with H.A.'s speech pathologist.

173. With willful intent, she failed to do her due diligence as required because she was a "hired gun."

174. Avoiding all documents, medical reports and data that would put Plaintiff RACHEL in a favorable light for custody was purposefully harmful to Plaintiff H.A..

34

175. While Plaintiff RACHEL was recognizing her son's Autism and putting his needs first, these family court players were concocting false accusations against Plaintiff RACHEL, labeling her "mentally ill." (*It is important to note here that H.A.'s special needs preschool in New York followed the IEP for H.A. as designed by the New York Board of Education.)

176. During the entire course of litigation, Plaintiff RACHEL and Robert Tandy were the only ones advocating for H.A.'s developmental needs.

177. The Defendants actions were and continue to be a clear violation of the Americans with Disability Act (ADA).

178. H.A. continues to suffer immediate and irreparable harm as a result.

179. Defendant DR. BASZCZUK broke confidentiality laws of the State of New Jersey as well as Federal HIPAA laws when having Plaintiff RACHEL sign a custody evaluation contract under duress, which illegally stated that Defendant DR. BASZCZUK could share session information with Defendant BRYAN ALINTOFF.

180. A basic ethical principle in the provision of psychological services involves the concept of confidentiality. Not only are psychologists bound by state law not to reveal any information conveyed by clients without their expressed written consent, but they are also bound by the APA Ethics Code to do so (if members of APA).

181. Defendant ESCANDON signed an order at the beginning of litigation stating that both parties must cooperate to the full extent with Defendant DR. WHITE. Defendant DR. BASZCZUK is employed by Defendant DR. WHITE, who appears to be related to Defendant ANDREA BETH WHITE. This is a conflict of interest.

182. That Judge Paul Escandon had already illegally stripped Plaintiff RACHEL of all legal and physical custody of her son just weeks prior, made Plaintiff RACHEL fearful to not sign the contract put forth by Defendant DR. BASZCZUK.

183. The fear of being punished by Judge Paul Escandon for not following court orders put Plaintiff RACHEL in a situation of duress. Plaintiff RACHEL's was told by her attorney at the time to sign Defendant DR. BASZCZUK's contract for risk of "making the judge mad again."

184. In order to be bound by a contract, a person must have capacity to contract. A person who is unable, due to mental impairment via duress, to understand what she is doing when she signs a contract lacks the capacity to contract.

185. It is more than reasonable to acknowledge that a mother fearful of once again losing access to her two-year-old child autistic child would be under duress and not have the capacity to sign a contract of this nature that she believed would directly influence Judge Escandon's actions against her.

186. Plaintiff RACHEL had no reasonable alternative but to agree to the contract under coercion. The unconscionability defense is concerned with the fairness of both the process of contract formation and the substantive terms of the contract.

187. Because the contract put forth by Defendant DR. BASZCZUK violates ethics codes, both State and Federal, the court was legally bound to strike down the contract as unconscionable.

188. Coercion, threats, false statements, or improper persuasion by one party to a contract is grounds for voiding a contract.

189. Defendant DR. BASZCZUK took advantage of Plaintiff RACHEL's situation of duress by misrepresenting the confidentiality laws of the State of New Jersey.

190. Defendant DR. BASZCZUK accidentally sent Plaintiff RACHEL an email where it is clear she was coaching Defendant BRYAN ALINTOFF on which documents would be beneficial to making his custody case stronger.

191. Defendant DR. BASZCZUK's loyalty to Defendant LOMURRO LAW FIRM, due to their referrals making up most, if not all, of Defendant DR. BASZCZUK's yearly salary as a custody evaluator to produce false favorable representations of Lomurro's litigants to the court, constitutes a pattern of racketeering activity.

192. In Plaintiff RACHEL's case, Defendant DR. BASZCZUK produced false findings to Monmouth County Courthouse and concealed facts with the sole purpose of remaining in good favor with Lomurro.

193. The "best interest of the child" which is the legal statue in which Defendant DR. BASZCZUK must conduct her custody evaluations was purposely distorted in both her custody report for the Alintoffs and her testimony at trial for her own professional gain and a clear indication of Honest Services Fraud.

194. Discovery of Defendant DR. BASZCZUK's records will likely show that she had frequent contact with Defendant BRYAN ALINTOFF's attorney and law firm both to be coach on her process and to assist in coaching Defendant BRYAN ALINTOFF.

195. Sharing Plaintiff RACHEL's custody sessions, emails, documents and phone calls with Defendant BRYAN ALINTOFF and his council for the purpose in colluding to

37

bring false allegations against Plaintiff RACHEL both in the written custody report and at trial is a illegal.

196. Defendant DR. BASZCZUK conducted a one-sided custody evaluation with a pre-determined outcome.

197. Plaintiff RACHEL is aware of at least five other women whose husbands are represented by Lomurro law firm and who have been forced to use Defendant DR. BASZCZUK as their "mutual" custody evaluator.

198. In several cases where the custody evaluation is completed, other female litigants have come forward to Plaintiff RACHEL as well as to make formal complaints with The New Jersey State Board of Psychological Examiners against Defendant DR. BASZCZUK's unethical practices. In these similar cases, Defendant DR. BASZCZUK has deemed all female litigants "mentally ill".

199. In Plaintiff RACHEL's case, Defendant DR. BASZCZUK diagnosed Plaintiff RACHEL ALINTOFF with "cyclical outbursts" and presented this diagnosis to Monmouth County Courthouse as a reason to not grant custody to Plaintiff RACHEL.

200. "Cyclical outbursts" is not a recognized mental disorder and does not exist in the Diagnostic and Statistical Manual of Mental Disorders.

201. At trial, Defendant DR. BASZCZUK repeatedly called Plaintiff RACHEL a "lunatic" from the witness stand and said that H.A. (who is Autistic) displayed "psychotic behaviors".

202. This is debase, inappropriate, and absolutely unethical, not only for Defendant DR. BASZCZUK, but for Defendant Judge GRASSO JONES, for it is a judge's responsibility to maintain order and decency in the courtroom.

203. These statements both within her custody evaluation report and on the witness stand show a gross animus against Plaintiffs RACHEL and her autistic son H.A., a gross animus that was manufactured by the Defendants in an ENTERPRISE.

### Early Intervention, Special Education and Related Services

204. The Individuals with Disabilities Education Act (IDEA) (formerly called P.L. 94-142 or the Education for all Handicapped Children Act of 1975) governs how states and public agencies provide early intervention, special education and related services to more than 6.5 million eligible infants, toddlers, children and youth with disabilities.

205. The law requires public schools to make available to all eligible children with disabilities a "free appropriate public education" in the least restrictive environment appropriate to their individual needs.

206. IDEA requires public school systems to develop appropriate Individualized Education Programs (IEP's) for each child. The specific special education and related services outlined in each IEP reflect the individualized needs of each student. IDEA also mandates that particular procedures be followed in the development of the IEP.

207. Each student's IEP must be developed by a team of knowledgeable persons and must be at least reviewed annually.

208. The law has been reauthorized many times and has expanded the scope of services to include services for infants and toddlers.

209. Judge Grasso Jones states in her custody order that one of the reasons that she was granting residential custody to Defendant BRYAN ALINTOFF was that in her mind, Plaintiff RACHEL had no right to put H.A. in a special needs class without Defendant BRYAN ALINTOFF's "permission."

210. This was false be it that Defendant BRYAN ALINTOFF wrote to the court in a motion asking that Plaintiff RACHEL hurry up in putting H.A. into a "free program" so that he wouldn't have to pay for the much needed private speech therapy H.A. was receiving under Plaintiff RACHEL's care in Brooklyn, NY.

211. Defendant GRASSO JONES uses Defendant DR. BASZCZUK's custody evaluation report in collusion and with violation of The Individuals with Disabilities Education Act (IDEA) to take residential custody from Plaintiff RACHEL stating that it is Plaintiff RACHEL that cannot co-parent because she put her son in a special needs school.

212. Evidence presented at trial shows that Plaintiff RACHEL tried desperately to convince Defendant BRYAN ALINTOFF that their son has a developmental issue that needed to be addressed immediately with Early Intervention, Special Education and Related Services which are upheld civil rights upheld by The Supreme Court for a child with Autism.

213. By refusing to acknowledge H.A.'s Autism and developmental needs, Defendant BRYAN ALINTOFF placed H.A. at significant risk to his development.

214. Defendant BRYAN ALINTOFF's actions of continually blocking developmental services to a disabled child, Plaintiff H.A., during the course of the last two years though the present is child endangerment and child abuse.

215. Calling Plaintiff RACHEL a "lunatic" for helping her son get early intervention for his Autism is wicked gaslighting and sadistic; and grossly beyond unprofessional.

216. Dr. Michael Walker, Executive Director at the New Jersey State Board of Psychological Examiners, told Plaintiff RACHEL that calling a client a "lunatic" on the witness stand or in a custody evaluation is grounds in and of itself for the removal of a Psychologist's license.

217. A child with autism needs treatment and early intervention is the best program to help a young child with autism.

218. Failure to give or secure that treatment is the basis for a child neglect case.

219. Both Federal and State laws protect children with autism and any child who needs special treatment and care.

220. It remains as mentioned above, that through the present, Plaintiff RACHEL along with her attorney, Robert Tandy, are the only ones advocating for H.A.'s special needs, and that that it how it's going to be for the foreseeable future.

221. It is imperative that this Court address this issue and allow this child to get the help he so desperately needs.

222. Defendant DR. BASZCZUK stated on the witness stand at trial that she believed H.A. to be "on the cusp" when asked what she meant by "on the cusp" she said, "of the autism spectrum" However, no mention of this was in her custody evaluation

report. Defendant DR. BASZCZUK's testimony was highly inconsistent, blaming Plaintiff RACHEL solely for H.A.'s behavioral issues and the next minute saying that H.A. is "on the cusp."

223. The reason for Defendant DR. BASZCZUK's inconsistency is because she is a "hired gun" and did not do an honest or real assessment of H.A.'s needs.

224. One of the tools mentioned for the diagnosis of autism is The Screening Tool for Autism in Two-Year-Olds. This can be found on the American Psychological Association website, the APA Guideline for Practitioners, including areas of child custody; the Practice Parameter: Screening and Diagnosis of Autism.

225. On the witness stand, Defendant DR. BASZCZUK made statements and accusations against Plaintiff RACHEL for seeking out professional medical answers to H.A.'s special needs when he was around age three, saying that H.A. was too young to be diagnosed with developmental issues and once again discrediting Plaintiff RACHEL's parenting by saying that seeking out such developmental support for a young child showed a type of "mental illness."

226. The Screening Tool for Autism in Two-Year-Olds not only exists but is recommended by the APA, it is fair to say that Defendant DR. BASZCZUK discriminated against Plaintiff RACHEL for her desire to get H.A. Early Intervention support.

227. Defendant DR. BASZCZUK used Plaintiff RACHEL's advocacy for H.A. and her diligence to get him the developmental support he needed against her and went as far to say on the record at trial that she had briefly considered Plaintiff RACHEL to

be suffering from Munchausen by Proxy Syndrome. When questioned further about her statement by Robert Tandy, Defendant DR. BASZCZUK retracted her unfounded and malicious diagnosis.

228. Furthermore, the averments as stated herein speak to a violation by the Defendants of Plaintiffs' Sixth Amendment rights, as this persecution of the Plaintiffs was quasi-criminal in nature. As such, the Defendants violated Plaintiffs' rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).

## JUDGE LINDA GRASSO JONES

229. Judge Grasso Jones based the bulk of her child custody decision on Defendant DR. BASZCZUK's report and testimony.

230. Defendant DR. BASZCZUK acted in Plaintiff RACHEL's case as a de facto judge by exercising power as if legally constituted.

231. Judge Grasso Jones had already made her custody decision before trial based on Defendant DR. BASZCZUK's verdict and colluded with Defendant JENNA SHAPIRO to block evidence and testimony attesting to H.A.'s autism and other developmental issues.

232. Defendant BRYAN ALINTOFF, Defendant DR. BASZCZUK, Lomurro law firm and Judge Grasso Jones employed psychological tactics such as gaslighting, coercive control, and gross manipulation of facts. They colluded in emotional abuse against Plaintiff RACHEL with the purpose of damaging her relationship with her Autistic son and emotional abuse in purposefully diminishing and blocking Plaintiff RACHEL's abilities to care for her developmentally delayed child.

233. The psychological abuse in Plaintiff RACHEL's case is a clear by countless acts of intimidation both by several judges in Monmouth County Courthouse by Defendant BRYAN ALINTOFF and by Defendant BRYAN ALINTOFF's council.

234. Defendant DR. BASZCZUK ignored all of the affidavits that praised Plaintiff RACHEL as a mother.

235. Defendant GRASSO JONES cast aside detailed reports of Defendant BRYAN ALINTOFF's alcoholism and blackouts, to the detriment of a child.

236. On the stand Defendant DR. BASZCZUK admitted that she took Defendant BRYAN ALINTOFF's word while disallowing vital witness testimony.

237. Defendant DR. BASZCZUK hid Defendant BRYAN ALINTOFF's drinking to excess and driving home to "care" for H.A. who at the time of this incident was only 2-years-old, nor did she mention the video, which was sent to her, showing Defendant BRYAN ALINTOFF's angry outburst directed at H.A..

238. Defendant DR. BASZCZUK wrote that H.A.'s behavior was psychotic and that Plaintiff RACHEL was the cause.

239. She willfully misdiagnosed H.A. and failed to identify the fact that he has ADHD, developmental delays and is on the autism spectrum. She had no business doing so as she is not an autism specialist.

240. Defendant DR. BASZCZUK was more intent upon blaming Plaintiff RACHEL for H.A.'s behavior than providing an accurate diagnosis consistent with Defendant LOMURRO's fraudulent legal prescription.

241. Judge Grasso Jones threatened repercussions against Plaintiff RACHEL if she were to post anything negative about Defendant DR. BASZCZUK on the Internet during trial. She essentially issued a verbal Gag Order.

242. This is not only a clear violation of Plaintiff RACHEL's Constitutional Rights to Freedom of Speech, but also a protective interest by Judge Grasso Jones to threaten Plaintiff RACHEL into not damaging Defendant DR. BASZCZUK's professional reputation.

243. Judge Grasso Jones took a vested interest in what is publicly said about Defendant DR. BASZCZUK and in doing so violated Plaintiff RACHEL's civil rights and acted as de facto counsel to Defendant DR. BASZCZUK.

244. Judge Grasso-Jones upheld all previous rulings, only allowing Plaintiff RACHEL to finally retrieve her personal belongings over two years after leaving the marital home.

245. Judge Grasso-Jones denied admission of multiple reports regarding Plaintiff RACHEL's son's diagnosis into evidence.

246. She denied Plaintiff RACHEL's request to have experts who had evaluated and treated H.A.'s special needs to testify at trial.

247. She refused to allow school records and reports as well as the report from the speech therapist that evaluated and treated H.A..

248. She would not allow any teachers or the school's director to testify as to H.A.'s personal deficits.

249. Defendant BRYAN ALINTOFF falsely claimed that H.A. does not have any developmental or any other problems. Judge Grasso-Jones refused to allow Plaintiff RACHEL to present professional reports and witnesses to counter charges that she was making up H.A.'s issues.

250. Mr. ALINTOFF's insistence that I Plaintiff RACHEL "made up" H.A.'s problems was used by Defendant BRYAN ALINTOFF and his attorney as part of the rationale for declaring, repeatedly, that she has a serious mental disorder, which is a pattern employed by family court players.

251. In giving custody to Defendant BRYAN ALINTOFF, Judge Grasso-Jones ignored the fact that H.A.'s father has been diagnosed by an alcohol evaluator (licensed clinical psychologist), who he called as a witness, as a binge drinker who engages in hazardous behaviors.

252. Defendant Grasso Jones deliberately misrepresented the testimony of the alcohol evaluator (Dr. Rotgers) in her custody ruling at the end of trial.

253. On the stand, under questioning, Dr. Rotgers admitted that, when writing his report, he miscalculated the amount of alcohol Defendant BRYAN ALINTOFF had drank the night he was observed by the private investigator drinking and driving.

254. He stated on the stand that Defendant BRYAN ALINTOFF was definitely intoxicated when he drove home to care for H.A. (who was only about 2 years old at the time) that evening. Dr. Rotgers also admitted that although Defendant BRYAN ALINTOFF does not drink every day, he drinks often and heavily enough to be diagnosed as an episodic heavy drinker (binge drinker).

46

255. This diagnosis was not in his report.

256. In her decision the judge characterized Dr. Rotgers' testimony as essentially being the same as what he wrote in his report, when he actually testified the opposite to what was in his report.   This is a purposeful fraudulent statement of facts.

257. Defendant Grasso Jones ignored the fact that Defendant BRYAN ALINTOFF had been observed, by a private investigator, to drink the equivalent of 8-10 glasses of wine, and to drive home to take care of his 2 year old son.

258. She also ignored the fact that 3 doctors of psychology sat on the stand and told her that giving custody of a child to a binge drinker was not in the best interests of the child.   Dr. Rotgers stated that Defendant BRYAN ALINTOFF's behavior is dangerous and that an episodic heavy drinker should not be the primary caretaker of a child.

259. The private investigator observed and obtained video of Defendant BRYAN ALINTOFF becoming angry at H.A. one afternoon, grabbing him by his wrists, shaking him and then throwing a CD in his direction.   In her decision, the judge characterized that incident as Defendant BRYAN ALINTOFF trying to prevent H.A. from continuing to misbehave.

260. Judge Grasso Jones accepting that throwing objects at an autistic child is part of "disciplining" is a gross and horrific violation to H.A. under the Americans With Disabilities Act (ADA).

261. H.A.'s autism and attention deficit issues require a care-giver with patience and understanding of H.A.'s disabilities.

262. Judge Grasso-Jones stated in her decision that Defendant BRYAN ALINTOFF did not seem to believe his son had special needs and that she was expecting Plaintiff RACHEL to be a strong advocate for obtaining the services H.A. requires.

263. The Judge knowingly created a situation guaranteed to be disruptive to both parents and detrimental to H.A.. Giving custody to the parent who fought against providing any services to his son and expecting the other parent to be the child's advocate in the face of direct opposition from the parent given primary custody is clearly not in the child's best interest.

264. It is done to perpetuate continuous litigation to ensure profit to the racketeers on a long-term basis and put litigants in untenable financial predicaments which result in foreclosures, which the judges, attorneys, and other family court players scoop up on short sales, false foreclosures, and mortgage fraud. It is a Ponzi scheme.

265. The fact that Judge Grasso-Jones states that she is aware of the situation indicates a lack of concern for what is best for a 5-year-old child who has been diagnosed as being on the autism spectrum.

266. Judge Grasso-Jones, in rejecting Plaintiff RACHEL's request for a "Stay" stated that she didn't know that H.A. was diagnosed as being on the autism spectrum.

267. It is collusion to reject evidence that speaks to the child's needs and then claim that you could not have known the child's medical health situation after refusing to allow any of that information in as evidence.

268. The Judge, in her decision, failed to mention that Defendant BRYAN ALINTOFF has been diagnosed as a binge drinker or that he actively opposed providing needed

services to his son, including threatening H.A.'s special needs school in Brooklyn if they didn't throw him out.

269. She used Defendant DR. BASZCZUK's report as the basis for taking H.A. away from his mother. Defendant DR. BASZCZUK said, in her report that Plaintiff RACHEL needed to be evaluated for a mental disorder and that she needs mental health therapy. That was the conclusion on which Judge Grasso-Jones made her decision.

270. Not only are there several psychological reports and notes from other psychologists stating that Plaintiff RACHEL has no symptoms of any psychological disorder, but there is absolutely nothing in Defendant DR. BASZCZUK's own report to support her conclusions. None of the psychological tests, reports or observations provide a basis for her conclusion.

271. Judge Grasso-Jones was asked to throw out Defendant DR. BASZCZUK's custody evaluation after it was learned that she had pled guilty to four (4) counts of ethics violations with the State of NJ.

272. Judge Grasso-Jones stated that the ethics violations were not relevant because they did not involve a custody case, however, it did involve a minor child.

273. Moreover, it is of serious concern that Defendant DYFS n/k/a DCP&P hired Defendant DR. BASZCZUK to perform State custody evaluations, despite these ethics violations. This speaks to the grave magnitude of putting children in crisis.

274. It appears as if Defendant Grasso Jones would be happy to hire someone who embezzled money from a bank to take care of her finances. She's not a bank, so stealing from a bank wouldn't be relevant.

275. Judge Grasso-Jones was made aware by a witness called, Ms. Kimberley Young, by Defendant BRYAN ALINTOFF that new ethics charges were filed against Defendant DR. BASZCZUK by that witness and by another woman. The judge asked the witness if Defendant DR. BASZCZUK would lose her license and was told that that is a real possibility.

276. Despite the ethics convictions and the new charges, despite the fact that Defendant DR. BASZCZUK admitted over and over again, on the stand, that almost all of the information in her report was obtained from Defendant BRYAN ALINTOFF, and that none of it was verified in any way, the judge stated in her decision that the report was helpful. She said that Defendant DR. BASZCZUK was a credible witness. In fact, almost the entire decision is simply an implementation of the Defendant DR. BASZCZUK's report, verbatim, making her a de facto judge.

277. The judge repeated over and over again in her decision that Plaintiff RACHEL ALINTOFF put H.A. in school without her husband's knowledge and consent and in violation of a court order. This is apparently a central issue to her, despite the fact that she has been provide evidence that showed that none of her allegations are true.

278. The judge states that Mr. ALINTOFF agreed, after the fact, to allow H.A. to stay in school because he realized it was important for him to get the help he needs. Blocking an autistic child from Early Intervention is a violation of ADA.

279. This is an unbelievable statement when the judge was presented with conclusive evidence that Defendant BRYAN ALINTOFF threatened the school's director at Special Sprouts in Brooklyn with professional ruin if she didn't throw H.A. out of the program.

280. In her decision, the judge states that she does not fault Plaintiff RACHEL for putting H.A. in a program for special needs children, and then says that that is one of the main reasons she is giving custody to Defendant BRYAN ALINTOFF.

281. This speaks to the discrimination and gaslighting that occurs at a phenomenal rate within the New Jersey Family Court System.

282. Judge Grasso-Jones, used what she had to know was a report rife with omissions and lies as the instrument to unjustly deprive H.A. an opportunity to live with the parent who would provide him with stability and the best chance to get the services he needs in order to lead as normal a life as possible.

283. Judge Grasso-Jones heard Defendant DR. BASZCZUK admit that she did not even attempt to verify the information that Defendant BRYAN ALINTOFF gave her about Plaintiff RACHEL.

284. Judge Grasso Jones permitted and encouraged a hostile Court environment as Defendant DR. BASZCZUK repeatedly stated, on the stand, that Plaintiff RACHEL

51

is a "lunatic" and that her husband is a "saint." That bias and unprofessional behavior was explained away by the judge rather than questioned.

285. Judge Grasso Jones fails to support in any justifiable way, anything other than retribution for Plaintiff RACHEL's actions against Judge Escandon to vindicate her rights.

286. Her decision mentions Judge Escandon and Plaintiff RACHEL's behavior of speaking to the press and Governor Christie at a town hall meeting. Judge Grasso Jones holds distain for Plaintiff RACHEL's right to Freedom of Speech since Plaintiff RACHEL's words go against her courthouse colleagues.

287. Judge Grasso Jones is "teaching" Plaintiff RACHEL a "lesson" at the expense of her autistic 5-year-old child.

## TAMARA SLOGOSKY

288. Defendant Judge ESCANDON employed his niece, Tamara Sloglosky, to work as his law clerk during the time that Plaintiff RACHEL was in front of Judge Paul Escandon, in 2011-2012.

289. Judge Escandon refused to provide discovery as to any and all forms he filled out prior to hiring Tamar Slogosky, when Plaintiff RACHEL and her attorney Robert Tandy attempted to get information as mentioned above in this Complaint.

290. This was a violation of Directive 17-08, Policy on the Appointment of Judges' Relatives to Judiciary Positions (Judiciary Anti-Nepotism Policy), issued on December 2, 2008 by Judge Glenn A. Grant, which appears to be somewhat of a

mirage as it is neither honored, nor enforced, even by Defendant GLENN GRANT himself.

291. Tamara Slogosky had ex parte communication with Defendants Andrea Beth White and Jenna Shapiro.

292. She ridiculed Plaintiff RACHEL and stated that Judge Escandon would not hear an Order to Show Cause for Plaintiff to regain custody of her young son.

293. Tamara Slogosky has professional knowledge that it is illegal to take custody of a child without having a preliminary hearing, yet continued to take enjoyment in denying Plaintiff RACHEL's attorney access to the Judge for reconsideration and blocked Plaintiff RACHEL's attorney from entering a public courtroom saying, "Judge Escandon said he doesn't even want to see you. I suggest you go away today. He said he already ruled on this and will not hear it again".

294. The appeals court eventually reversed Judge Escandon's illegal ruling and custody was returned to Plaintiff RACHEL up until the trial.

295. Defendant TAMARA SLOGOSKY gave the appearance of impropriety by displaying an inappropriate familiarity with Bryan Alintoff, which resulted in bias against Plaintiff RACHEL.

296. Ms. Slogosky displayed a heightened animus towards Plaintiff RACHEL after Plaintiff RACHEL won her emergent appeal.

297. Ms. Slogosky exhibited and administered preferential treatment towards Defendant BRYAN ALINTOFF and his attorneys ANDREA BETH WHITE and JENNA SHAPIRO throughout the litigation before Defendant ESCANDON.

298. Ms. Slogosky exhibited ex parte communication by oral and written communications relevant to the merits of Plaintiff RACHEL's case that was not placed on the record.

299. Tamara Slogosky regularly faxed Judge Escandon's decisions only to Defendant BRYAN ALINTOFF's law firm LOMURRO and excluded the information from Plaintiff RACHEL's attorney.

## JENNA SHAPIRO, ESQ.

300. In a long list of New Jersey rules of professional conduct, Jenna Shapiro has violated dozens in the Alintoff case.

301. In the ABA Model Rules of Professional Conduct, which serve as the basis for most rules of professional conduct for lawyers, Rule 3.5(b) prohibits lawyers from communicating ex parte with judges and other court officials during a proceeding, except as permitted by law or court order.

302. The prohibition against ex parte communications with judges is designed to protect the opposing party's right to a fair hearing and, ultimately, the impartiality and integrity of the courts.

303. The ex parte communication in Plaintiff RACHEL's case is extensive – Defendant JENNA SHAPIRO engaged in illegal and unethical ex parte communications with Judge Escandon, Judge Grasso Jones, Judge Grasso Jones's law clerk as well as Judge Escandon's law clerk, Tamara Slogosky.

304. Plaintiff RACHEL ALINTOFF's was denied her right to a fair hearing in part because of this repeated breach of ethics, collusion, and racketeering.

305. The Court has adopted ABA Model Rule 8.4, which defines "professional misconduct." The Debevoise Committee had recommended adoption of an earlier version containing two additional paragraphs, but the provisions of those paragraphs are included in ABA Model Rule 5.5 ("Unauthorized Practice of Law"), which the Court has adopted as RPC 5.5. Defendant JENNA SHAPIRO's professional misconduct included "Discrimination" against Plaintiff RACHEL ALINTOFF -- derogatory or demeaning language, and, generally, any conduct towards the named groups that is both harmful and discriminatory.

306. By creating a fake mental illness allegation that Defendant JENNA SHAPIRO knows to be untrue, Defendant JENNA SHAPIRO coached Defendant BRYAN ALINTOFF in a strategic maneuver for child custody.

307. As a lay person, New Jersey does not permit a person to testify as to what mental illness they believe their spouse may have. However, in the Alintoff trial, Defendant BRYAN ALINTOFF was allowed to speak at length about Plaintiff RACHEL's "mental illness".

308. Judge Grasso Jones allowed Defendant BRYAN ALINTOFF to testify about Plaintiff RACHEL's "mental illness" because the decision to grant custody to Mr. ALINTOFF was predetermined and the Judge wanted to allow as much favorable testimony to Mr. ALINTOFF's side as possible.

309. Defendant JENNA SHAPIRO took part in a tort of malice where she created false evidence and accusations and coached her client on divorce planning through abusive practices including vexatious litigation.

310. Defendant JENNA SHAPIRO practiced vexatious litigation by bringing legal action against Plaintiff RACHEL which was brought solely to harass or subdue Plaintiff RACHEL ALINTOFF and to bankrupt her rendering Plaintiff RACHEL to not be at equal playing field as Defendant BRYAN ALINTOFF in the litigation.    Filing vexatious litigation is considered an abuse of the judicial process.

311. Defendant JENNA SHAPIRO helped Defendant BRYAN ALINTOFF launch a baseless case against Plaintiff RACHEL and used Lomurro, Davison, Eastman and Munoz's law firm connections in Monmouth County Courthouse (such connections and conflicts of interest include the assignment Judge Lawrence Lawson's daughter is an attorney at Lomurro law firm) to benefit her client's case.

312. Defendant JENNA SHAPIRO is liable for malicious prosecution.

313. Defendant JENNA SHAPIRO violated State and Federal law by demanding that evidence during trial be blocked that showed H.A.'s developmental needs and Autistic diagnosis.

314. This evidence did not coincide with Defendant JENNA SHAPIRO's made up allegations that Plaintiff RACHEL ALINTOFF is the only one to think her son has developmental issues and that the reason Plaintiff RACHEL believes her son to be Autistic is because she is "mentally ill."

315. Rule 402 General Admissibility of Relevant Evidence states that relevant evidence is admissible in a trial unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court.

316. Since custody decisions in the State of New Jersey are to be based on "the best interest of the child" it is not legal for Judge Grasso Jones to have blocked medical records showing H.A.'s developmental needs.

317. Defendant JENNA SHAPIRO and Judge Grasso Jones acted in collusion when blocking evidence that Plaintiff RACHEL ALINTOFF and her attorney put forth to be on the record and both Shapiro and Judge Grasso Jones violated yet another Constitutional Right of Plaintiff RACHEL's, her 14th Amendment Right. Defendant JENNA SHAPIRO, Lomurro law firm, Judge Grasso Jones and Defendant DR. BASZCZUK orchestrated a calculated and strategic method for creating a false record to the court.

## LOMURRO LAW FIRM

318. Defendant DR. BASZCZUK has sold her loyalty as a custody evaluator to the Lomurro law firm in exchange for a steady stream of referrals to do custody evaluations.

319. The referrals from Defendant LOMURRO constitute a very high percentage of her income, estimated at 90% or more.

320. However, when asked, on the stand, she claimed to have no idea how many reports she does or how much of her income is the result of referrals from LOMURRO LAW FIRM.

321. Her fee for Plaintiff RACHEL ALINTOFF's custody evaluation was over $50,000.

322. This kind of a relationship should raise a "red flag" as to possible ethics violations on the part of the law firm. Representing such a large portion of a supposedly independent evaluator's income is collusion and rackateering.

323. The fact that Defendant DR. BASZCZUK, always makes recommendations in favor of the Lomurro client brings the relationship into the realm of an unethical cooperation to "win" custody cases using Defendant DR. BASZCZUK's consistently falsified and biased evaluations and reports.

324. Lomurro has structured their relationship with Defendant DR. BASZCZUK to present overwhelmingly skewed recommendations in their clients' favor.

325. The results have been devastating. Because the court relies so heavily on the custody evaluator's report, a number of mothers have had their children taken away as the direct result of Dr. Baszczuk's biased reports.

326. She consistently omits or ignores information detrimental to the husband's interests and takes as the truth, without any verification, whatever the husband alleges.

327. An example, from a case that Plaintiff RACHEL has firsthand knowledge of, Defendant DR. BASZCZUK is the custody evaluator where the husband's attorney is also from Lomurro law firm.

328. Both sons repeatedly told Defendant DR. BASZCZUK that they are afraid of their father, that he has a bad temper, that there is no food in the house (verified by others), that they want to live with their mother and that their father physically abused the older son.

329. Defendant DR. BASZCZUK described the complaints in her custody evaluation report, but did not report the abuse complaint to the proper agency as she is obligated to do by law.

330. Also, she did not discuss or consider any of the above information in her conclusion that the children should be with their father. She based her decision on the fact that the mother needs to be evaluated by a mental health professional and should go for therapy.

331. As in the Alintoff case, none of the evidence presented in Defendant DR. BASZCZUK's custody report, whether obtained from outside sources or by Defendant DR. BASZCZUK directly through testing and observation contains information to support a diagnosis of mental illness of the mother of any kind.

332. This establishes a pattern where Defendant DR. BASZCZUK uses false diagnosis of mental illness against mothers in cases where the father is being represented by Lomurro law firm.

333. This was true of Defendant DR. BASZCZUK's report in Plaintiff RACHEL's case as well. In the case described above, child welfare has declared their intention to intervene and take the children away from the father because he has not provided a safe or healthful environment for them.

334. All of the information that they have cited was provided to Defendant DR. BASZCZUK, who not only ignored it, but found that the father was doing a good job of providing for his children.

335. This is clearly collusion involving the law firm and their "hired gun" custody evaluator, this cannot be just a difference of opinion.

336. The husbands, represented by Lomurro all make the same unfounded allegations and Defendant DR. BASZCZUK's reports have the same formula and the same boilerplate language.

337. She determines that the wife is mentally ill. She claims, also without any evidence, that the wife has emotional outbursts and recommends a neuropsychological or psychological evaluation and therapy.

338. She claims that they are less likely to co-parent and that they are less likely to allow a normal relationship between the child and the husband's family.

339. All of these issues are extremely important to the court, which, based on Defendant DR. BASZCZUK's contrived report and recommendations places the child with his/her father.

340. Defendant DR. BASZCZUK and Lomurro always ask for her reports to be sealed, making it difficult for the wives to have enough access and to have others review the report in order to defend against the serious accusations made against them.

341. Not inconsequentially, sealing the reports is designed to make any sort of investigation more problematic.

342. This resonates with Franz Kafka and Nellie Bly.

343. It is difficult to find a type of professional behavior more unethical and worthy of severe punishment than knowingly, repeatedly, setting about to corrupt the process of finding the truth in order to make the proper decision for children.

344. That these custody evaluations unjustly deprive mothers of their children and children of their mothers, shows the callous, unethical nature of the Lomurro Law firm and Defendant DR. BASZCZUK.

345. LOMURRO LAW FIRM engineered and implemented this system, using a willing professional all too eager to sell Kids for Cash.

## ANDREA BETH WHITE, ESQ.

346. In a long list of New Jersey rules of professional conduct, Andrea Beth White has violated dozens of them in the Alintoff case.

347. The Court has adopted ABA Model Rule 8.4, which defines "professional misconduct." The Debevoise Committee had recommended adoption of an earlier version containing two additional paragraphs, but the provisions of those paragraphs are included in ABA Model Rule 5.5 ("Unauthorized Practice of Law"), which the Court has adopted as RPC 5.5.

348. Defendant JENNA SHAPIRO's professional misconduct included discrimination against Plaintiff RACHEL ALINTOFF -- derogatory or demeaning language, and, generally, any conduct towards the named groups that is both harmful and discriminatory.

349. Defendant ANDREA BETH WHITE manufactured a "flight risk" allegation towards Plaintiff RACHEL after her client BRYAN ALINTOFF would not comply with the Consent Agreement by selling his newly purchased firearm and Plaintiff RACHEL sought to protect their young son.

350. Said Defendants asked Judge Escandon to impose supervised visitations on Plaintiff RACHEL in October 2011, to take place only in the State of New Jersey and Judge Escandon illegally granted this "emergent" motion without a preliminary hearing.

351. Plaintiff RACHEL ALINTOFF was denied her Constitutional Rights to a preliminary hearing.

352. A preliminary hearing is best described as a "trial before the trial" at which the judge decides, not whether the Defendant is "guilty" or "not guilty," but whether there is enough evidence to force the Defendant to stand an immediate custody trial. In making this determination, the judge must use the "probable cause" legal standard.

353. In Plaintiff RACHEL's case, both legal and physical rights to her son were taken from her without due process.

354. Ms. White, Bryan Alintoff and Judge Paul Escandon violated Plaintiffs' Freedom of movement in asking and in granting this motion.

355. As far back as the circuit court ruling in *Corfield v. Coryell*, 6 Fed. Cas. 546 (1823), the Supreme Court recognized Freedom of Movement as a fundamental Constitutional right.

356. In Plaintiff RACHEL's case in front of Judge Paul Escandon, he violated yet another Constitutional Right of Plaintiff RACHEL's by finding her guilty of a made-up flight risk allegation and disregarding her right to act in the best interest of her son, H.A.

357. The Due Process Clause of the Fourteenth Amendment requires that severance in the parent-child relationship caused by the state occur only with rigorous protections for individual liberty interests at stake. *Bell v. City of Milwaukee*, 746 F 2d 1205; US Ct App 7th Cir WI, (1984).

358. From the moment Defendant LOMURRO LAW FIRM took Defendant BRYAN ALINTOFF's divorce case, they began coaching him on how to lie to the court, come up with false allegations against Plaintiff RACHEL, hide money during divorce proceedings and strategically maneuver the case by committing fraud and colluding with Judges, custody evaluators and law clerks within Monmouth County's court circuit in an effort to win child custody so that Defendant BRYAN ALINTOFF could "punish" Plaintiff RACHEL for leaving him and avoid paying child support for their son.

359. Ms. White is guilty of racketeering since she works and operates as an attorney in Monmouth County Courthouse, which is run as an enterprise.

360. LOMURRO LAW FIRM is Monmouth County Courthouse's biggest player and they are rewarded by almost never losing a case.

361. The former assignment Judge, Judge Lawrence Lawson's daughter is an attorney at LOMURRO LAW FIRM.

## SCOTT ALINTOFF

362. Defendant SCOTT ALINTOFF gave fraudulent statements to the court in a signed affidavit.

63

363. Defendant BRYAN ALINTOFF forwarded marital mail to Defendant SCOTT ALINTOFF's house in New Jersey concerning finances, taxes, bank records and commodities trading information months before divorce was filed.

364. It is Plaintiff RACHEL's belief that deposition would show that Defendant SCOTT ALINTOFF helped his brother move and hide marital assets from Plaintiff RACHEL.

365. This is collusion.

366. Defendant SCOTT ALINTOFF should be investigated for helping Defendant BRYAN ALINTOFF with investment fraud, IRS income violations, and conspiracy.

367. At last known, Defendant SCOTT ALINTOFF is the sole beneficiary of Defendant BRYAN ALINTOFF's will.

368. Defendant SCOTT ALINTOFF is the chief operating officer of SunGard's Asset Management business and its VPM solution suite. The VPM suite specializes in portfolio accounting solutions for the alternative investments community for which Defendant SCOTT ALINTOFF oversees all aspects of services and software development.

369. Defendant BRYAN ALINTOFF also works closely with customers to develop new software for the rapidly changing world of complex instruments, including swaps, bank debt, credit default swaps (CDS) and other security types. He has extensive knowledge of hedge fund back-office operations, systems, investment products and fund structures.

370. With over 15 years of experience in financial services, servicing both the front and back office, Defendant BRYAN ALINTOFF began his career at Ernst & Young, conducting audits of large financial institutions and working in mergers-and-acquisitions and bankruptcy teams.

371. He went on to numerous asset management roles, has worked for one of the largest options market-making firms on the American Stock Exchange and was head of finance for a commodity pool operator. Defendant BRYAN ALINTOFF holds Series 3, 7, 63 and 65 licenses and is a licensed American Stock Exchange market maker.

372. It appears Defendant BRYAN ALINTOFF has his hands in inside trading and discloses privy information to the balance of the Defendants.

## JILL ALINTOFF

373. Defendant JILL ALINTOFF, gave fraudulent statements to the court in a signed affidavit.

374. BRYAN ALINTOFF began forwarding marital mail to Jill Alintoff's house in New Jersey concerning finances, taxes, bank records and commodities trading information months before divorce was filed.

375. It is Plaintiff RACHEL's belief that Jill Alintoff helped her brother-in-law move and hide marital assets from Plaintiff RACHEL.

376. This act violates federal statues.

377. Defendant JILL ALINTOFF should be investigated for helping Mr. Bryan Alintoff with investment fraud, IRS income violations, fraud and conspiracy.

378. Defendant JILL ALINTOFF helped BRYAN ALINTOFF in fraudulent divorce planning.

379. Moreover, Defendant JILL ALINTOFF is an attorney that began her career as a prosecutor for the NYC Administration for Children's Services, where she litigated hundreds of cases involving issues of child welfare. In 2012, Jill became a freelance appellate "pool attorney" for the NJ Office of the Public Defender/Office of Parental Representation.

380. She has an interest in this case and has coached Defendant BRYAN ALINTOFF.

### LARRY ALINTOFF

381. Defendant BRYAN ALINTOFF's brother, Larry Alintoff, gave fraudulent statements to the court in a signed affidavit.

382. Defendant BRYAN ALINTOFF filed his taxes in Westchester County, NY where his brother was living during the first for tax fraud purposes even though Mr. Bryan Alintoff was permanently residing in Brooklyn, NY and working in Manhattan.

383. Larry Alintoff's willingness to help his brother hide money from the Federal Government and New York State, shifted gears during the marriage between Defendant BRYAN ALINTOFF and Plaintiff RACHEL to helping his brother hide martial assets.

384. It is reasonable to believe that there were others violations unknown at present.

385. Larry Alintoff should be investigated for helping Defendant BRYAN ALINTOFF with investment fraud, deferring income in an effort to misrepresent annual income to the court, IRS income violations, fraud and conspiracy.

386. Larry Alintoff helped Bryan in financial divorce planning, which may have been implemented as far back as before the marriage took place.

387. Defendant BRYAN ALINTOFF created phony debt by colluding with friends and family to establish phony loans and phony expenses.

388. On the witness stand, Defendant BRYAN ALINTOFF said that he is "not financially backed" by his brother for his commodities trading however, discovery of financial records will show that Mr. Bryan Alintoff is working and trading for his brother Larry.

389. Defendant LARRY ALINTOFF helped transfer stock and investment accounts into the names of family members, business partners and possibly dummy companies knowing the assets can be transferred back after the divorce.

**ANDREA ALINTOFF**

390. Andrea Alintoff is Bryan's Alintoff's sister-in-law. On November 5, 2014, Andrea Alintoff purchase a home in Palm Beach Gardens, Florida.

391. In January 2011 Andrea Alintoff supposedly purchased a property in Jupiter, Florida.

392. Defendant BRYAN ALINTOFF is listed as a residence at the Jupiter Florida property.

393. Discovery of the bank records involving this property are likely to show that Defendant BRYAN ALINTOFF has been making payments to the mortgage in an effort to hid marital assets.

## ELIZABETH BREDBENNER

394. Elizabeth Bredbenner has helped Defendant BRYAN ALINTOFF hide money, move marital assets into other bank accounts, and misrepresent both State and Federal taxes.

395. She inserted herself into this case by submitting a fraudulent affidavit to Defendant DR. BASZCZUK.

396. Defendant ELIZABETH BREDBENNER has a criminal record with a DUI, yet BRYAN ALINTOFF allows her to drive with Plaintiff H.A. in the car.

397. She is involved in a drinking and driving lawsuit where she injured the innocent parties of the other vehicle.  Defendant BRYAN ALINTOFF was with the night of the accident and allowed her to drive impaired even though he was witness and accomplice to the number of drinks she consumed that evening.

## ERIC DINOWITZ

398. Eric Dinowitz was a financial backer to Defendant BRYAN ALINTOFF.

399. Defendant BRYAN ALINTOFF perjured himself on the stand during trial regarding his dealings and relationship with Defendant ERIC DINOWITZ.

400. Defendant BRYAN ALINTOFF deferred hundreds of thousands of dollars of income at the onset of divorce and used martial assets to redirect these funds into his

own commodities trading account to make it look as though he were his own financial backer.

## JESSICA A. RONAN;

## DYFS n/k/a DCP&P

401. Defendant JESSICA RONAN was the child services social worker assigned to Bryan ALINTOFF's case.

402. She currently works for the New Jersey Department of Children and Families.

403. She lied on the witness stand about the validity of Plaintiff RACHEL's complaints to DYFS and only retracted her comments after an audio tape recording was played at trial of Ms. Ronan's conversation with Plaintiff RACHEL revealed that she said, "Your case most certainly rises to the standards of concern."

404. Instead of voicing concern on the witness stand for Defendant BRYAN ALINTOFF delaying DYFS investigation by hiring a DYFS attorney and by forbidding them entrance into his home, Ms. Ronan was more concerned with self-interest, having voiced more upset at having been recorded without her knowledge.

405. The recording upset Ms. Ronan because it was proof that she had perjured herself on the witness stand. The "best interest of the child" was not a concern for Ms. Ronan and she did a sub-par investigation.

## JEANNE ASHMORE

406. Jeanne Ashmore is the Director of Constituent Relations, Governor Chris Christie's office, who served as GOP Congressman Leonard Lance's district director and joined Christie's team four years ago.

69

407. Her job is to respond to constituent's mail, email and in-person requests. Ms. Ashmore is no longer with Governor Christie's administrations.

408. Ms. Ashmore was served with a subpoena for her possible knowledge and involvement with the Bridgegate investigation and left her position shortly after.

409. During the time when Judge Paul Escandon was assigned to Plaintiff RACHEL's divorce case, Ms. Ashmore was still director of constituent relations at the governor's office.

410. After speaking at a town hall meeting, Plaintiff RACHEL was given Ms. Ashmore's contact information by Governor Christie. Over the course of two years, Ms. Ashmore insisted that she could not help Plaintiff RACHEL or the hundreds of other women who were calling the Governor's office with similar complaints of corruption for Monmouth Courthouse and from other counties within New Jersey across the entire State.

411. Plaintiff RACHEL gave Ms. Ashmore's office telephone number to over 80 women who contacted Plaintiff RACHEL directly for help since Plaintiff RACHEL's case of court corruption was so public.

412. Although Ms. Ashmore started off her interactions with Plaintiff RACHEL as pleasant and helpful by supposedly forwarding Plaintiff RACHEL's formal complaints to the ACJC, Ms. Ashmore quickly shifted gears with Plaintiff RACHEL and the hundred other women who called for help stating over and over again to Plaintiff RACHEL and others that, "Governor Christie cannot do anything

about what happens inside the courthouses.  It is outside his jurisdiction and as I've told you before we have helped you all we can."

## JUDGE LESLIE-ANN M. JUSTUS

413. Judge Justus upheld all of Judge Escandon's rulings, denying an increase in Pendente Lite, new requests for legal fees and expert fees.  She quashed virtually all of the subpoenas for witnesses Plaintiff RACHEL requested.

414. Judge Justus engaged in illegal ex-parte communications with Jenna Shapiro.

415. This is a grave obstruction of justice and violates 14th Amendment Rights.

416. Judge Justus denied Plaintiff RACHEL access to the marital home to gather her and H.A.'s personal belongings.

417. Plaintiff RACHEL's husband was under court order to provide health insurance for her and H.A., but refused to cover either of them in Brooklyn, where they lived, Judge Justus allowed Defendant BRYAN ALINTOFF to deny health care coverage in New York.

418. Rather, Judge Justus allowed Defendant BRYAN ALINTOFF down-graded Plaintiff RACHEL's health care and H.A.'s health care insurance policy.

419. Against court orders, Defendant BRYAN ALINTOFF insisted that there be a transfer of car title to Plaintiff or he would not pay the car insurance. Judge Justus refused to enforce those court-ordered responsibilities or any others.

420. Defendant BRYAN ALINTOFF attempted to commit car insurance fraud.

421. The Court punished Plaintiff RACHEL for refusing to commit insurance fraud.

422. Judge Justus, after being voted the worst lawyer in NJ and the worst judge in Monmouth County by a lawyers' group, reportedly had a nervous breakdown and Plaintiff RACHEL's case was transferred to Judge Grasso-Jones.

423. Judge Justus was mentally incapacitated during some, if not all, of the time she was making decisions in the Alintoff case.

424. The assignment judge, Judge Lawson, was well aware of this and not only allowed Judge Justus to remain on the bench, but put pressure on her to return.

425. Judge Justus intimidated, threatened, and forced Plaintiff RACHEL to divulge private information about others to Jenna Shapiro with details about what she posted on the Internet against Judge Paul Escandon.

426. Judge Justus forced Plaintiff RACHEL to disclose the author of blogs that talked about Monmouth Court corruption and specifically, anything posted that put Judge Escandon in a negative light in an attempt to curb Plaintiff's First Amendment Rights.

## GOVERNOR CHRIS CHRISTIE

427. Defendant Governor CHRISTIE has influenced and implemented an agenda of false imprisonment in the State of New Jersey through the following: a) The George Washington Bridge scandal in Fort Lee, NJ concocted and put into effect by his administration; b) His cancellation of the ARC Tunnel Project (a deceptive paradox to defraud the public considering all the transit villages he's building); and c) Plaintiffs' detainment and false imprisonment in State of New Jersey by Defendant STATE.

72

428. Despite having a Property Settlement Agreement with bargained-for terms that she could remove her children from the State of New Jersey, Defendants colluded and conspired to deprive RACHEL and her child of their rights.

429. Moreover, there is a common denominator in all three situations stated above – all are instances where individuals were trying to leave the State of New Jersey and were detained either directly or indirectly, through force, obstruction, coercion, or threats.

430. In addition, it is important to note here that this bears a strong semblance to Karin Wolf's case presently before the Federal Court in Newark, in which she alleges the same restrictions on her Freedom of Movement.

431. Defendants engaged in a pattern of racketeering activity of RICO ENTERPRISES to deprive Plaintiffs of their rights including Right to Freedom of Movement, to falsely imprison Plaintiffs and kidnap Plaintiff H.A., which are indictable offenses.

432. Defendant CHRISTIE routinely appoints corrupt judiciaries or otherwise fails to remove them. He fails to remedy the family court crisis in the State of New Jersey. Organizations such as the Nurtured Parent and the NJ Coalition for Family Court Reform have implored him to take action through newspaper ads, social media, phone calls, letters, court protests, etc.

433. Defendant CHRISTIE is well aware of the Judge Escandon scandal where a large group of women are petitioning to have Escandon impeached, which corroborates Plaintiffs' allegations and assertion that Defendants are engaged in a pattern of racketeering activity and RICO ENTERPRISE to oppress women.

434. The Judge Escandon scandal was broadcast by Sarah Wallace of Channel 7 News last year. The women she interviewed, including Plaintiff RACHEL, have and continue to be punished by Defendant STATE and its courts for speaking up.

435. Moreover, CHRISTIE and STATE manipulate the media to keep the family court crisis out of the news and obstruct public knowledge of it, which constitutes as fraud.

436. He consistently misleads his constituents and gives them false hope. Individuals have stood up at town hall meetings stating their grievances to him. He claims he will act, then doesn't. He's been dubbed The Governor of Divorcegate.

437. Plaintiff RACHEL first spoke with Governor Christie back in 2011, whereupon he represented to her that he would "personally see what's going on over there in Monmouth County Courthouse."

438. After putting Plaintiff RACHEL in contact with Jeanne Ashmore, Plaintiff RACHEL wrote countless letters alerting Governor Christie and Ms. Ashmore of judicial malfeasance, attorney corruption & the Monmouth County NJ family court racketeering.

439. Ms. Ashmore's job required her to respond to constituent's mail, email and in-person requests.

440. Plaintiff RACHEL requested several meeting with Governor Christie proposed to speak about the Petition to Impeach Judge Paul Escandon where a group of women were looking for support from the governor to impeach.

441. In October 2014, Plaintiff RACHEL was able to speak directly with Governor Christie at Storm Sandy anniversary press conference in Belmar, New Jersey.

442. A witness, Kimberly Young, who was with Plaintiff RACHEL when speaking to Governor Christie, heard the Governor say that he knew exactly who Plaintiff RACHEL was from calls to his office and prior meetings.

443. Plaintiff RACHEL told Governor Christie about her case and the recent retaliation decision of Judge Grasso Jones to grant custody to Defendant BRYAN ALINTOFF. Governor Christie hugged Plaintiff RACHEL and told her, "I am going to help you. I am going to personally see to it that your case goes to the State Attorney General for a criminal investigation." However, it is clear from the subsequent events that this served no purpose other than to pacify and patronize Plaintiff.

444. After two years of being told by Jeanne Ashmore that the Governor has absolutely no jurisdiction in her case, it appears that Plaintiff RACHEL was lied to and that the Governor can call for a criminal investigation whenever he sees fit.

445. Plaintiff RACHEL forwarded her entire case to Jim Gilroy at the Governor's office along with a letter written to the State Attorney General to be forwarded.

446. Plaintiff RACHEL has not heard anything from the State Attorney General on her case and as the weeks turn into months, H.A. is further and further at risk in regressing from all the progress he made while in Plaintiff RACHEL's care.

447. Hundreds of women have contacted Plaintiff RACHEL throughout the past three years looking for help.   Plaintiff RACHEL put all of them in touch directly with Governor Christie's office.

448. In a letter to Governor Christie by Karen Welch, a women Plaintiff RACHEL
knows very well from organizational groups and social media dealings with court
corruption in the State of New Jersey, Karen Welch wrote:

> *"We NJ women and mothers currently suffering through a corrupt family
> court system implore you to ask the USDOJ to investigate the family court.  I
> thought that I had seen it all.  I thought that I had endured it all. My divorce
> was final in the mid 1990's.  Over the course of the next **15 years**, I was
> criminally stalked and stalked through the family court. The FBI got involved
> in my case in 1999 after I was stalked to Disneyworld and received calls to
> my hotel room on my birthday from an individual using the voice changer
> from the movie Scream to sing Happy Birthday to me."*

> *"Beginning in 2000, I was dragged to the family court by an attorney in
> violation of a judgment of divorce that required mediation before going to
> court on a child related issue.  In court in 2001, the criminal stalking was
> used against me to paint me as unstable in an attempt to take my child away
> from me.  In 2007, another motion seeking custody of my child was filed.
> Judge Guadagno resolved the matter entirely in my favor and his decision on
> the illegal subpoena of police reports I filed to document my stalking became
> a published opinion. In 2008, Judge Guadagno was transferred to another
> county and the motions began again under a new judge.  My decade long
> criminal stalking case was the impetus to update the NJ criminal stalking
> statute to incorporate third party stalking and elevate the level of the crime.*

*In 2009, Governor Corzine signed my legislation (A1563) into law. Around an August 2009 family court hearing meant to resolve all issues I began to receive recorded threats deemed credible by the FBI. Joe Pate, the suspect in my federal stalking case admitted to the FBI and police he was stalking and threatening to kill me and then Pate committed suicide to avoid federal prosecution."*

*"Investigation Discovery Channel filmed a documentary on my 10+ year criminal stalking case entitled Stalked: Someone's Watching "Dangerous Games". After the documentary aired NJ women with similar cases of criminal stalking and stalking through the family court reached out to me. Through them I learned the family attorney dragging me to court for a decade had a baby fathered by a family court judge.* **_I realized the judge who presided over my case in 2001 was none other than the baby daddy of the attorney who dragged me to court_**. *The ethics case against this attorney has been pending **four years** after being remanded twice by the NJ State Disciplinary Review Board. The Advisory Council on Judicial Conduct declined to investigate the judge because he is retired. This Judge and this attorney had an open relationship in the court house. In violation of court rules, the court order for the hearing where the Judge's baby mama attorney appeared before him neglected to include the attorney's name. On August 21, 2013, I began asking to inspect my file and get a copy of an order from the first hearing where the judge's baby mama appeared before him in my*

77

*case and according to Elisabeth Strom the acting clerk for the Superior Court, my file has gone missing. NJ is run amuck with corruption in the family court. Good mothers are losing custody of their children and filing for bankruptcy because of unethical attorneys and corrupt judges.    Please Governor Christie – we implore you to call for a Federal investigation into the family court corruption."*

## THE COUNTY OF MONMOUTH

449. The Borough of Eatontown in Monmouth County engaged in a search for a new judge after seeing court revenues drop by more than 20 percent under prior judge, George Cieri, who appeared from press accounts to have good judicial temperament, fairness, and some compassion for assessing lower fines for the poor people who often came before him.

450. The problem surfaced when one councilman had no shame (Dennis Connelly a retired Eatontown cop who as of November 2014 was elected as Eatontown's new major) was urging his fellow council members to pick one attorney over another, and sole criteria was that this particular attorney was known to be a great revenue collector for the township in which he was currently employed as a judge.

451. Mr. Connelly also had the temerity to write according to press accounts that young and aggressive officers who were writing a lot summonses might get discouraged if the wrong judge was chosen.

452. All this was confirmed by the courage of the attorney Eugene Melody III, of Martin Melody in Little Silver, who pulled his name from the selection process when he

wrote. The town's expectations are "inimical to my interpretation of how the constitution intended the third branch of government to function."

453. The issue of generating revenue over justice was also confirmed by Judge Cieri who complained to Judge Lawson about being pressured by the township.

454. The inherit conflict between justice and revenues in Monmouth County Courthouse is a Statewide problem.

455. In February of 2005, FBI agents swept through Monmouth County and arrested 11 current and former public officials on extortion and other charges, capping a long-running probe that prosecutors said proved corruption was pervasive in the region.

## OPERATION BID RIG

456. Operation Bid Rig is an ongoing, long-term investigation into political corruption in New Jersey conducted by the Federal Bureau of Investigation, the Internal Revenue Service, and the United States Attorney for the District of New Jersey since 2002.

457. The investigation has resulted in the indictments of more than 60 public officials and politically connected individuals since its inception. In July 2009, sting operations resulted in the arrest of 44 people in New Jersey and New York, including 29 public servants and political operatives, and five orthodox rabbis from the Syrian Jewish community.

458. A number of high-level New Jersey elected officials were arrested in the operation, including Jersey City Deputy Mayor Leona Beldini, Hoboken Mayor Peter Cammarano, Secaucus Mayor Dennis Elwell, Ridgefield Mayor Anthony R. Suarez, former Jersey City Housing Authority Commissioner and Chairwoman Lori

Serrano, Jersey City Housing Authority Commissioner Edward Cheatam,
Assemblyman L. Harvey Smith, Assemblyman Daniel M. Van Pelt, former
Assemblyman and unsuccessful mayoral candidate Louis Manzo, and political
operatives Joseph Cardwell and Jack Shaw.

459. Operation Bid Rig originated with investigations of public corruption among New
Jersey officials in Monmouth and Ocean counties. The first phase became public in
2002 when former Ocean Township Mayor Terrance D. Weldon pleaded guilty to
extorting cash from developers to influence the approval of building projects. The
second phase of the investigation resulted in the February 2005 arrests of 11 elected
officials in Monmouth County, who were charged with taking bribes from an
undercover cooperating witness.

## MONMOUTH COUNTY SUPERIOR COURT OF NEW JERSEY

460. Abuse of judicial power is impermissible. It is well settled that courts may not
disregard plain statutory language. In the words of the late Chief Justice Vanderbilt,
"[a] clear and unambiguous statute is not open to construction or interpretation, and
to do so in a case where not required is to do violence to the doctrine of the
separation of powers." *Watt v. Mayor and Council of Borough of Franklin,* 21 *N.J.*
274, 277, 121 *A.2d* 499 (1956). ***where the language of a law is clear, courts are
not free to replace it with unenacted legislative intention, for to do so leads the
judiciary into undemocratic law making. *State vs. Moss* (Super. Ct. App. Div. 1994).
649 *A.2d* 1349, 277 *N.J. Super.* 545.

461. When Monmouth County Courthouse conspired to withhold all Lomurro cases that went in front of Judge Escandon during the record request made by Plaintiff RACHEL and Robert Tandy, Plaintiff RACHEL was oppressively harmed by abuses of Judicial Discretion in its failure to accord her procedural rights including but not limited to the deliberate concealment of the missing documents.

462. By the severity of the restrictions imposed on Plaintiff RACHEL during supervised visitation whereas Judge Escandon illegally stripped Plaintiff RACHEL of all legal rights to her son, H.A. without a preliminary hearing, Monmouth Courthouse did nothing to rectify the injustice.

463. Much of Plaintiff RACHEL's experience with the court system and judges in Monmouth County is very similar to that of others, especially women, where there is a pattern of abusive, contemptuous, and prejudicial treatment by the judges and officials.

464. Plaintiff RACHEL declared bankruptcy and her parents had to spend money that they could not afford.  The guidelines are clear, but are they are purposefully ignored.

465. Plaintiff RACHEL has spoken to many women who were impoverished by Monmouth court and, as a result, had no money to appeal decisions or pay for experts that they needed.

466. This is a "pay to play" environment and prevents women from gaining access to their rights of due process.

467. This is extortion.

468. The transcripts for Plaintiff RACHEL's trial, that are needed in order to file an appeal cost over $22,000 because only the court can provide them and by one vendor only. This is a monopoly of services.

469. This, plus legal fees, sets an unattainably high bar which denies equal justice to those that the court has already treated unfairly.

470. There is no meaningful oversight of judges in New Jersey and there is no penalty for anyone in the system. Judges ignore the law, lawyers lie to an alarming degree and are never questioned or asked to prove what they say.

471. In Plaintiff RACHEL's case there were two psychologists who made false and misleading statements, Defendant DR. BASZCZUK and Dr. Rotgers, who wrote a report filled with significant, purposeful inaccuracies and engaged in illegal ex parte communications with Jenna Shapiro.

472. Under cross examination Dr. Rotgers finally told the truth and said on the record that Defendant BRYAN ALINTOFF is an episodic heavy drinker who practices dangerous drinking habits.

473. Judge Grasso Jones ignored his expert testimony because it spoke to Plaintiff RACHEL's favor and did not place Defendant BRYAN ALINTOFF as a suitable parent for primary residency of H.A.

474. In Plaintiff RACHEL's case, even though she was able to expose the lies told in motions and at trial, Judge Grasso-Jones chose to ignore the entire substance of the trial, forcing her to file a costly appeal and causing irreparable damage to her autistic son by forcing him to live with a father who abuses alcohol and who is more

interested in having a perfect child than in recognizing the developmental needs of his autistic son.

## ADMINISTRATIVE OFFICE OF THE COURTS (AOC);

## JUDGE GLENN A. GRANT

475. Countless letters and complaints have been sent to Mr. Grant concerning the rampant court corruption with the State of New Jersey.

476. Plaintiff RACHEL ALINTOFF has firsthand knowledge of dozens of these letters that were sent along with documentation proof showing illegal rulings from judges throughout New Jersey.

477. Plaintiff RACHEL sent letters and made phone calls to Glenn A. Grant about Judge Escandon over a timeline of more than two years.

478. On the New Jersey Courts website it reads:

*"As part of an effort to improve the administration of justice in New Jersey, the state constitution gave the Chief Justice authority over the management of the courts. To help the Chief Justice fulfill those management duties, the constitution directed the Chief Justice to appoint an Administrative Director of the Courts. Glenn A. Grant is the Acting Administrative Director of the New Jersey Courts."*

479. Acting Administrative Director Glenn A. Grant was appointed by Chief Justice Stuart Rabner effective September 1, 2008. A judge of the Appellate Division of Superior Court, Judge Grant had served as the presiding judge of the family division in Essex Vicinage.

480. While on the bench, Judge Grant served as the chair of the Conference of Presiding Judges—Family Division from 2007 to 2008, and as chair of the Conference's Children in Court Committee from 2005 to 2007.

## JOANNE M. DIETRICH

481. Joanne M. Dietrich is the Assistant Director, Family Practice Division. The Family Division consists of many parts and encompasses all aspects of family life. Family-related cases, such as those involving divorce, domestic violence, juvenile delinquency, child support, foster-care placements, adoption, custody and visitation and terminations of parental rights, are heard in the Family Division of Superior Court. About 350,000 cases are handled in the Family Division each year.

## ADVISORY COMMITTEE ON JUDICIAL CONDUCT (ACJC); JOHN A. TONELLI

482. Plaintiff RACHEL filed a complaint against judges named as defendants herein, enumerating the facts as alleged herein and cited Defendants' offenses towards their other alleged victims.

483. Defendant ACJC failed to conduct a proper investigation, if any, and dismissed the complaint.

484. Defendants ACJC and STATE are covering up Defendants' fraud.

## THE STATE OF NEW JERSEY

485. Defendant STATE of NEW JERSEY is ultimately responsible for the actors of its state.

## JUDGE LAWRENCE M. LAWSON

486. Plaintiff RACHEL has implored Defendant LAWSON to take action against the judges named herein as well as other Defendants employed in the Monmouth County Courthouse and he refused.

487. By allowing ESCANDON to run rampant, LAWSON has perpetuated an obstruction of justice and constitutional violations; and aided and abetted a pattern of racketeering activity and RICO ENTERPRISE in violation of federal law, which is inimical to justice and the public; and is therefore liable to Plaintiffs and any other litigants suffering under ESCANDON, GRASSO JONES, and JUSTUS for damages.

488. Defendant is therefore liable for damages to Plaintiffs and any other litigants suffering under these judges.

489. Defendant judges have retaliated against Plaintiff RACHEL for addressing her grievances with the appropriate authorities.

### CHIEF JUSTICE STUART RABNER

490. Plaintiff RACHEL and her family members have contacted Chief Justice Stuart Rabner dozens of times over the course of the past three years.

491. Stuart Rabner has been made well aware of divorce lawyers in New Jersey illegally conspiring with judges to steal from parents as part of a racketeering criminal enterprise. Mr. Rabner is involved with civil rights violations, fraud and obstruction of justice.

492. Stuart Rabner is personally responsible for overseeing the crime committed by the attorneys and social workers in their courtroom. Chief Justice Rabner has a legal and ethical duty to 'ensure rights' under the judicial canons of conduct.

85

493. He is well aware of the corruption running rampant in the New Jersey State Family Courts, yet he allows it to continue for profit. This type of judicial collusion is a serious crime and supports fraudulent activity.

494. Since there is no oversight at the state level, it is imperative that the Federal Courts step in and that a jury of the people hears this case.

## JUDGE LISA P. THORNTON

495. Around July 2014, Chief Justice Stuart Rabner appointed Judge Lisa Thornton to replace Assignment Judge Lawrence Lawson, who retired after having led the Monmouth vicinage since 1993.

496. In a public statement, Judge Thornton stated, *"I am humbled and delighted to be named by Chief Justice Rabner to lead this outstanding body of judges and staff in Monmouth County," Judge Thornton said. "It is a great honor to succeed Judge Lawson into the chambers of the assignment judge, and I will strive to maintain and advance the successes of his tenure."*

497. This is a gross misrepresentation to the people of New Jersey and falls under False Advertising as a cause of action.

498. Since her inception as the Assignment Judge at Monmouth County Courthouse, countless complaints of civil rights violations have abounded.

499. Facts such as drug addiction, infidelity and child abuse have been blatantly disregarded in her courtroom.

## THERESA ROMANO

86

500. Ms. Romano referred Plaintiff RACHEL to the ACJC upon complaint, which was nothing more than a means to pacify, patronize, and obstruct.

## OFFICE OF THE ATTORNEY GENERAL

501. The Office of the Attorney General's Mission Statement reads:

*"The mission of the Department of Law and Public Safety is to protect the safety, security, and quality of life of the people of New Jersey through an integrated and coordinated structure of law enforcement and regulatory agencies. The Department represents the public's rights and interests in all legal matters. With ten divisions, as well as independent commissions and boards, the department has wide-ranging responsibilities critical to the people of New Jersey. The Attorney General, as head of the department, serves as the state's chief law enforcement officer and legal advisor, and is responsible for the management and administration of the department. The Attorney General oversees the criminal justice system, protects the safety of the public, and defends the state against lawsuits. The Department regulates the casino, boxing, alcoholic beverage and racing industries. The Department also protects consumers against fraud. While these responsibilities are varied, the Department is singularly united in protecting the safety and security of all those who live, work, and visit New Jersey."*

http://www.nj.gov/oag/aboutus.htm

87

502. This is a gross misrepresentation to the people of New Jersey and falls under False Advertising as a cause of action.

503. Plaintiff RACHEL and many other parents across the State of New Jersey have complained to the Attorney General of New Jersey, which consistently and systematically fails to act.

504. The AG supports the misconduct because it is part of the racket and RICO ENTERPRISE along with all the other Defendants named herein.

505. In order for these RICO ENTERPRISES to work, they need a support system where they are no repercussions.

### ALLISON ACCURSO

506. As law clerk to Judge Grasso Jones during Plaintiff RACHEL's custody trial, Allison Accurso engaged in collusive ex parte communications with Jenna Shapiro, to the detriment of Plaintiffs.

### NEW JERSEY BAR ASSOCIATION

507. Defendant New Jersey Bar Association supports the unethical behavior of its members to the detriment of the Plaintiffs and the public.

508. Its About section reads reads:

### *"About NJSBA"*

*"As the voice of New Jersey attorneys, we support our more than 18,000 members by fostering professionalism, advancing personal development and encouraging participation. The New Jersey State Bar Association is a*

*voluntary membership that can keep you current, expand your network, influence legislative outcomes and provide exclusive discounts and benefits."*

509. Its Mission Statement reads:

### *"Our Mission"*

*"To serve, protect, foster and promote the personal and professional interests of its members.*

*To serve as the voice of New Jersey attorneys to other organizations,*

*governmental entities and the public with regard to the law, legal profession and legal system.*

*To promote access to the justice system, fairness in its administration, and the independence and integrity of the judicial branch.*

*To encourage participation in voluntary pro bono activities.*

*To foster professionalism and pride in the profession and the NJSBA.*

*To provide educational opportunities to New Jersey attorneys to enhance the quality of legal services and the practice of law.*

*To provide education to the New Jersey public to enhance awareness of the legal profession and legal system."*

http://www.njsba.com/about/

510. This is a gross misrepresentation to the people of New Jersey and falls under False Advertising as a cause of action.

511. Moreover, the "About" section states that it "influence[s] legislative outcomes."

512. Given the collusion and incestuous of the New Jersey Court System, it is reasonable to believe that a reasonable layperson would find that "influence" corrupt, especially when the acronym RICO includes that word.

513. Plaintiff RACHEL and many other parents across the State of New Jersey have complained to the Attorney General of New Jersey, which consistently and systematically fails to act.

514. The AG supports the misconduct because it is part of the racket and RICO ENTERPRISE along with all the other Defendants named herein.

515. In order for these RICO ENTERPRISES to work, they need a support system where they are no repercussions.

## BRYAN ALINTOFF

516. Defendant BRYAN ALINTOFF hired Defendant LOMURRO LAW FIRM long before divorce proceedings began.

517. Part of Lomurro's services to their clients is divorce planning which includes instructing litigants how to hide marital assets, delete incriminating emails and personal files from the family computer, "establishing" mental illness for the spouse and colluding to put the client in good favor with a handpicked Judge from Monmouth County courthouse.

518. That is exactly what happened in this case.

519. Bryan was paying back Larry Alintoff a "loan" back from 2003.

520. This was designed as a way to dissipate marital assets and store these assets elsewhere.

521. Accordingly, Plaintiff RACHEL asked Judge Paul Escandon for an Order restraining Bryan from any further dissipation of marital assets, which was denied.

522. Since filing for divorce, Bryan cut Plaintiff RACHEL off from access to marital accounts and continued to hide marital assets.

523. Defendant closed out joint Chase accounts (one with a balance of over $180,000) and changed the pass code on the other Chase account.

524. Defendant removed his name from a joint JetBlue American Express credit card, dumping all the debt on Plaintiff RACHEL.

525. Defendants colluded her to put Plaintiff RACHEL in an untenable financial predicament that drove her directly to bankruptcy.

526. This is a Federal crime.

527. Defendant BRYAN ALINTOFF has insisted throughout the divorce proceedings and to the present time that H.A. does not have any developmental delays and should not be diagnosed as being on the autism spectrum.

528. Defendant refused to take Plaintiff H.A. to receive speech therapy by a private therapist.

529. Defendant refused to discuss a school program to help H.A. with his problems.

530. When, on advice of several professionals, including H.A.'s pediatrician, Plaintiff RACHEL enrolled H.A. in a Board of Education program for special needs children, Defendant threatened the school's director with professional ruin if she did not throw H.A. out of the program.

531. Defendant consistently lied to and withheld information from professionals and from the school in Long Branch.

532. Defendant has consistently thwarted Plaintiff RACHEL's attempts to get H.A. the help he requires.

533. That, combined with the Long Branch school's admitted inability to provide the special education and additional instruction that the NYC IEP outlined and that they promised to implement, has made H.A.'s first and formative educational experience a frustrating one.

534. He has been identified as being different from the other children in the class by his behavior, because he cannot meet the expected standards in a regular classroom environment, and by the school's response of placing a 12-pound beanbag on him to keep him seated.

535. Another problem symptomatic of the situation H.A. is in is that he has not been eating his lunches at school.

536. H.A. is not well coordinated and tends to be distractible. He needs close supervision in order to do simple things like eat his lunch within the allotted time.

**ROSEMARY MARINAN GABRIEL**

537. Defendant Rosemary Marinan Gabriel did not allow Plaintiff RACHEL access to public court records until Plaintiff RACHEL hired a Civil Rights attorney.

538. She was well aware of collusion and racketeering within the courthouse as she has been cc'd on hundreds of emails sent over the course of the past three (3) years, complaining about civil and constitutional rights violations of mothers and children.

## MARGARET HARTMAN

539. Andrea Beth White and Jenna Shapiro were involved in witness tampering. The Alintoffs hired Margaret Hartman as a marital therapist a year-and-a-half prior to the divorce being filed.

540. During Plaintiff RACHEL's sessions with Ms. Hartman, they spoke at length about Defendant BRYAN ALINTOFF's drinking problems and his black outs as well as the mental and verbal abusive Plaintiff RACHEL had to deal with when Defendant BRYAN ALINTOFF was drunk and at other times as well.

541. Ms. Hartman extensively took notes on all sessions. She would type continuously throughout the sessions recording almost everything that was said in writing. During therapy, Margaret Hartman suggested Alanon meetings for Plaintiff RACHEL to help her deal with what Ms. Hartman diagnosed as Defendant BRYAN ALINTOFF's alcohol issues.

542. When Plaintiff RACHEL reached out to Ms. Hartman at the onset of divorce filings to obtain her own personal session notes, Ms. Hartman was willing to comply.

543. When Plaintiff RACHEL received what Ms. Hartman had sent to her in the mail, it was just a synopsis of the session notes and not the notes in their entirety.

544. Plaintiff RACHEL called to speak with Ms. Hartman who told her that since they last spoke, Defendant BRYAN ALINTOFF and Andrea Beth White had called her to "clarify" things.

545. Ms. Hartman yelled at Plaintiff RACHEL for not going to Alanon meetings and told Plaintiff RACHEL that after speaking with Bryan and his attorney, she now believes that Plaintiff RACHEL made-up the accusations of Defendant BRYAN ALINTOFF's drinking.

546. Ms. Hartman refused to provide Plaintiff RACHEL with her full session notes and told her that if she contacted her again, she would view it as harassment.

## NICHOLETTE PEARSALL

547. Nicholette Pearsall is the School Social Worker at Joseph M. Ferraina Early Childhood Learning Center in Monmouth County. At the beginning of H.A.'s entrance into the school, Nicholette Pearsall wrote a letter at the request of Defendant BRYAN ALINTOFF stating that the IEP from Brooklyn, NY would be implemented.

548. This letter made fraudulent statements since the IEP was never implemented in it's entirety and New Jersey State Law prohibits New Jersey from implementing an IEP without doing their own evaluations and testing of the child.

549. This letter was meant to be used in a court appear in front of Judge Grasso Jones where Plaintiff RACHEL and her attorney were asking for a Stay of the recent custody decision with the main issue being that H.A. has an IEP in Brooklyn NY

94

and that any set back to his developmental support would be detrimental to his progress.

550. H.A. went without services for weeks after entering JMF School. At a meeting with Nicholette Pearsall and other school staff, Ms. Pearsall stated (comments are audio recorded and have been transcribed) that she did not believe H.A. to have any developmental issues.

551. It was not until Plaintiff RACHEL sought to hire a developmental needs advocacy attorney that Nicholette Pearsall implemented speech and occupational therapy for H.A.. Ms. Pearsall's unprofessional defensive nature makes it impossible for Plaintiff RACHEL to have an active role in H.A.'s special needs care.

552. Against the IEP from Brooklyn and against Plaintiff RACHEL ALINTOFF's request, Nicholette Pearsall placed H.A. in a regular classroom situation and not an integrated class, which he so desperately needs. The teacher assigned to H.A.'s kindergarten class does not have a developmental needs educational background.

553. She has no knowledge of how to teach or guide children with autism. Plaintiff RACHEL has visited H.A.'s classroom and observed H.A. having extreme difficulty in sitting still, paying attention and following directions as the other children do.

554. There is no re-directional support for H.A.. Being that the class has over 26 students (none of which are autistic beside for H.A.), the teacher lets H.A. jump around the room and get up out of his seat repeatedly without knowing how to teach and nurture a child with autism.

555. At an early meeting with Ms. Pearsall, it came to Plaintiff RACHEL's attention that a heavy bean weight in the shape of a dog was being placed on H.A.'s lap during circle time and other activities that required H.A. to "sit still without rocking and without getting up" The restraint bean bag was an outrage to Plaintiff RACHEL. The school did not stop using this restraint even after Plaintiff RACHEL had shown concern and objected to it's use.

556. It was mentioned over a month later at a parent-teacher conference (also recorded and transcribed for the court's review).   Plaintiff RACHEL requested in writing to the school's principal, Mrs. Loretta Johnson, that she would like to see this weighted bean bag being put on H.A.'s lap.

557. For over a month, the school blocked Plaintiff RACHEL's request to see the bean weight.  Plaintiff RACHEL was not permitted entrance into the school at dismissal on Wednesday afternoon even though she had an appointment with H.A.'s kindergarten teacher.

558. When the school found out that Plaintiff RACHEL ALINTOFF was looking to view the bean weight, they said she could not come in and that the appointment had to be cancelled.

559. At the parent-teacher conference where Ms. Pearsall was present, Plaintiff RACHEL requested to see the bean weight again.

560. This time Plaintiff RACHEL was told that the restraining weight was not in the building.   Ms. Pearsall not only had full knowledge of the restraining weight being used on H.A., but approved its continued use.

561. Weeks later when Plaintiff RACHEL ALINTOFF was finally allowed to view the bean weight, she found out that it weighs over 10 pounds which is one third H.A.'s body weight.

562. It is a civil rights violation to restrain an autistic child. When Plaintiff RACHEL requested the test protocols that were used to determine H.A.'s IEP at the school, Ms. Pearsall wrote her saying she could not have copies of them. This is a violation of the Freedom of Information Act and an attempt to cover up

## Monmouth County Office of Education

563. Defendant MONMOUTH COUNTY OFFICE OF EDUCATION has full knowledge of Joseph M. Ferraina Early Childhood Learning Center in Monmouth County's violations of State and Federal law involving ADA and H.A.'s developmental rights. They are aware that H.A. was illegally restrained during class time by weighted object in front of teacher and other students. A civil rights violation and objected to by Plaintiff RACHEL ALINTOFF.

## Joseph M. Ferraina Early Childhood Learning Center

564. The judge's expectation that her plan of having Plaintiff RACHEL advocate for H.A.'s needs would insure him the education that he requires, is not working.

565. Defendant BRYAN ALINTOFF from the beginning, actively undermining any influence that Plaintiff RACHEL might have had with the school by telling staff and parents that Plaintiff RACHEL was found to be mentally ill and the school promoted this defamation of character by allowing Judge Grasso Jones' 100 page

custody decision to be in H.A.'s New Jersey State school folder which will follow him for his entire school career if left in NJ.

566. After requests to the school principal asking for the removal of this document, which contains statements from Dr. Baszczuk claiming that Plaintiff RACHEL suffers from mental illness, the principal, Ms. Johnson, refused.

567. All decision at the school are being dictated by Defendant BRYAN ALINTOFF even though the school is aware that there is joint legal custody between the two parents. During Plaintiff RACHEL's first meeting at the Long Branch school she discovered that her husband had placed the judge's entire 100-page custody decision in H.A.'s son's school folder.

568. Mrs. Johnson was asked in writing to remove it because it is prejudicial against Plaintiff RACHEL and all that was needed in H.A.'s file was the actual parenting-time schedule which does not contain personal details of the custody decision, but the school has refused.

569. On more than one occasion Defendant BRYAN ALINTOFF encouraged the staff to read the decision so that they could understand why Plaintiff RACHEL is not to be believed about our H.A.'s developmental needs.

570. Other professional reports that described the results of evaluations were not provided to the school by Defendant BRYAN ALINTOFF and were not in H.A.'s folder until Plaintiff RACHEL made copies and insisted his full medical record was accounted for.

571. A letter from H.A.'s pediatrician in New Jersey placed in his folder by Mr.
ALINTOFF stated that H.A. has no developmental or any other problems. In
discussing this letter with the pediatrician, she informed Plaintiff RACHEL that
Defendant BRYAN ALINTOFF filled out the medical history form indicating that
H.A. did not have any developmental delays.

572. No reports from other physicians or from the numerous other professionals that have
evaluated H.A. were provided to the pediatrician. She stated to Plaintiff RACHEL
that Mr. ALINTOFF had misled her by withholding information (conversation
recorded).

573. Defendant BRYAN ALINTOFF advocated for our son to receive fewer speech
sessions each week, claiming that H.A. doesn't need them. The school acceded to
his request and now provides 2 rather than the 3 speech therapy sessions a week that
were recommended and were originally agreed to.

574. Mr. ALINTOFF's goal is for H.A. to receive no extra services, thereby being able to
portray H.A. as being the "perfect" child he wants. This is a narcissistic trait often
present in perpetrators of domestic violence.

575. Plaintiff RACHEL is concerned that the school will agree to further reduce services.
Defendant NICOLETTE PEARSALL told Plaintiff RACHEL that they need only
one parent's consent to make changes in H.A.'s program. Plaintiff RACHEL did
not agree to the current IEP in place for H.A. since it is a severe reduction in
services for H.A. and does not diagnosis him as autistic. Defendant BRYAN

99

ALINTOFF signed the IEP and it was implemented without Plaintiff RACHEL's signature.

576. Over time it became obvious that the school is acting as if it has a vested interest in declaring that H.A. has some symptoms of ADHD that can be successfully handled in a regular class. They do not have the facilities, the money or the qualified staff to provide what H.A. needs, therefore, claiming that he needs less, which is a perfect fix for the school, but a violation of H.A.'s rights under the ADA.

577. The school's speech therapist tested H.A. and found no deficiencies or delays. She is the only professional in any discipline to find no deficiencies or developmental delays.

578. After she submitted her report Plaintiff RACHEL had H.A. tested by a NJ licensed doctor of speech pathology, who found H.A. to have a severe deficit in "practical speech."

579. Practical speech relates to the ability to express ones-self in conversation. This is exactly what would be expected for a child who is on the autism spectrum.

580. In a meeting with the school's staff and their lawyer, he informed Ms. Alintoff that the Long Branch school district simply does not have the resources to implement the IEP, as recommended by the New York team of professionals. For example, the Long Branch school district does not have any integrated classrooms; nor do they have the trained special education teachers to assign to H.A.'s classroom.

581. The lack of an additional teacher in the room and the absence of any special education teachers have left the classroom teacher to resort to placing a 12 pound beanbag, in the shape of a dog, on H.A.'s lap to keep him seated.

582. Even after their own school psychologist found H.A. to have a significant deficit in practical speech, they have not acknowledge H.A.'s problem and have not increased the number of speech therapy sessions to the original number they had agreed to.

583. The school recognizes that H.A. has advanced skills in reading and math, but does not have the ability to provide the extra instruction that was part of the NYC IEP.

584. The school is failing H.A. in their inability to provide special education for his deficits and in their failure to provide extra instruction to further his abilities in areas where he excels.

585. Only very recently, after I found out and corrected the fact that my husband lied about having sole legal authority, has the school been sending me notices of events and meetings.

586. They still forward all of my communication with them to my husband while forwarding none of his to me.

587. When H.A. went to the school nurse, Defendant BRYAN ALINTOFF was the only parent the school notified. Plaintiff RACHEL found out about the incident only after H.A. told her.

## History of Federal case law supporting Plaintiffs' rights

588. In *Paul v. Virginia*, 75 U.S. 168 (1869), the Court defined Freedom of Movement as "right of free ingress into other States, and egress from them."

589. The United States Supreme Court has stated: "There is a presumption that fit parents act in their children's best interests, *Parham v. J. R.,* 442 U. S. 584, 602; there is normally no reason or compelling interest for the State to inject itself into the private realm of the family to further question fit parents' ability to make the best decisions regarding their children. *Reno v. Flores,* 507 U. S. 292, 304.

590. Plaintiff RACHEL was denied her parental rights even though she is a fit parent and has no history of alcoholism, drug abuse, arrests, etc. The orders manufactured under this RICO ENTERPRISE by Defendants goes against well-established that Federal case law that the state may not interfere in child rearing decisions when a fit parent is available. *Troxel v. Granville*, 530 U.S. 57 (2000).

591. It violates Plaintiff RACHEL's constitutional right to raise her young child. There is a wealth of additional case law that supports this:

   a. "No case authoritative within this circuit, however, had held that the state had a comparable obligation to protect children from their own parents, and we now know that the obligation does not exist in constitutional law." *K.H. Through Murphy v. Morgan*, 914 F.2d 846 (C.A.7 (Ill.), 1990.

   b. "Rights to marry, have children and maintain relationship with children are fundamental rights protected by the Fourteenth Amendment and thus, strict scrutiny is required of any statutes that directly and substantially impair those rights." P.O.P.S. v. Gardner, 998 F2d 764 (9th Cir. 1993)  "Parents right to rear children without undue governmental interference is a fundamental component of due process." *Nunez by Nunez v. City of San Diego*, 114 F3d 935 (9th Cir. 1997).

   c. "The rights of parents to the care, custody and nurture of their children is of such character that it cannot be denied without violating those fundamental

102

principles of liberty and justice which lie at the base of all our civil and political institutions, and such right is a fundamental right protected by this amendment (First) and Amendments 5, 9, and 14." *Doe v. Irwin*, 441 F Supp 1247; U.S. D.C. of Michigan, (1985).

d. "The several states have no greater power to restrain individual freedoms protected by the First Amendment than does the Congress of the United States." *Wallace v. Jaffree*, 105 S Ct 2479; 472 US 38, (1985).

e. The United States Supreme Court has stated: "There is a presumption that fit parents act in their children's best interests, Parham v. J. R., 442 U. S. 584, 602; there is normally no reason or compelling interest for the State to inject itself into the private realm of the family to further question fit parents' ability to make the best decisions regarding their children." *Reno v. Flores*, 507 U. S. 292, 304. "The state may not interfere in child rearing decisions when a fit parent is available." *Troxel v. Granville*, 530 U.S. 57 (2000).

f. "Loss of First Amendment Freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. Though First Amendment rights are not absolute, they may be curtailed only by interests of vital importance, the burden of proving which rests on their government." *Elrod v. Burns*, 96 S Ct 2673; 427 US 347, (1976).

g. Law and court procedures that are "fair on their faces" but administered "with an evil eye or a heavy hand" was discriminatory and violates the equal protection clause of the Fourteenth Amendment. *Yick Wo v. Hopkins*, 118 US 356, (1886).

h. "Even when blood relationships are strained, parents retain vital interest in preventing irretrievable destruction of their family life; if anything, persons faced with forced dissolution of their parental rights have more critical need for procedural protections than do those resisting state intervention into ongoing family affairs." *Santosky v. Kramer*, 102 S Ct 1388; 455 US 745, (1982).

i. "Parents have a fundamental constitutionally protected interest in continuity of legal bond with their children." *Matter of Delaney*, 617 P 2d 886, Oklahoma (1980). .

j. "The liberty interest of the family encompasses an interest in retaining custody of one's children and, thus, a state may not interfere with a parent's custodial rights absent due process protections." *Langton v. Maloney*, 527 F Supp 538, D.C. Conn. (1981).

103

k.  "Parent's right to custody of child is a right encompassed within protection of this amendment which may not be interfered with under guise of protecting public interest by legislative action which is arbitrary or without reasonable relation to some purpose within competency of state to effect." *Regenold v. Baby Fold, Inc.*, 369 NE 2d 858; 68 Ill 2d 419, appeal dismissed 98 S Ct 1598, 435 US 963, IL, (1977).

l.  "Parent's interest in custody of her children is a liberty interest which has received considerable constitutional protection; a parent who is deprived of custody of his or her child, even though temporarily, suffers thereby grievous loss and such loss deserves extensive due process protection." *In the Interest of Cooper,* 621 P 2d 437; 5 Kansas App Div 2d 584, (1980).

m.  "The Due Process Clause of the Fourteenth Amendment requires that severance in the parent-child relationship caused by the state occur only with rigorous protections for individual liberty interests at stake." *Bell v. City of Milwaukee*, 746 F 2d 1205; US Ct App 7th Cir WI, (1984).

n.  "Father enjoys the right to associate with his children which is guaranteed by this amendment (First) as incorporated in Amendment 14, or which is embodied in the concept of "liberty" as that word is used in the Due Process Clause of the 14th Amendment and Equal Protection Clause of the 14th Amendment." *Mabra v. Schmidt,* 356 F Supp 620; DC, WI (1973).

o.  "Separated as our issue is from that of the future interests of the children, we have before us the elemental question whether a court of a state, where a mother is neither domiciled, resident nor present, may cut off her immediate right to the care, custody, management and companionship of her minor children without having jurisdiction over her in personam. Rights far more precious to appellant than property rights will be cut off if she is to be bound by the Wisconsin award of custody." *May v. Anderson*, 345 US 528, 533; 73 S Ct 840, 843, (1952).

p.  "A parent's right to care and companionship of his or her children are so fundamental, as to be guaranteed protection under the First, Ninth, and Fourteenth Amendments of the United States Constitution." *In re: J.S. and C.,* 324 A 2d 90; supra 129 NJ Super, at 489.

q.  The Court stressed, "the parent-child relationship is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection. A parent's interest in the companionship, care, custody and management of his or her children rises to a constitutionally secured right, given the centrality of family life as the focus for personal meaning and responsibility." *Stanley v. Illinois*, 405 US 645, 651; 92 S Ct 1208, (1972).

r.    Parent's rights have been recognized as being "essential to the orderly pursuit of happiness by free man." *Meyer v. Nebraska*, 262 US 390; 43 S Ct 625, (1923).

s.    The U.S. Supreme Court implied that "a (once) married father who is separated or divorced from a mother and is no longer living with his child" could not constitutionally be treated differently from a currently married father living with his child." *Quilloin v. Walcott*, 98 S Ct 549; 434 US 246, 255^Q56, (1978).

t.    "The U.S. Court of Appeals for the 9th Circuit (California) held that the parent-child relationship is a constitutionally protected liberty interest. (See; Declaration of Independence --life, liberty and the pursuit of happiness and the 14th Amendment of the United States Constitution -- No state can deprive any person of life, liberty or property without due process of law nor deny any person the equal protection of the laws.)" *Kelson v. Springfield*, 767 F 2d 651; US Ct App 9th Cir, (1985).

u.    "The parent-child relationship is a liberty interest protected by the Due Process Clause of the 14th Amendment." *Bell v. City of Milwaukee*, 746 f 2d 1205, 1242^Q45; US Ct App 7th Cir WI, (1985).

v.    "No bond is more precious and none should be more zealously protected by the law as the bond between parent and child." *Carson v. Elrod*, 411 F Supp 645, 649; DC E.D. VA (1976).

w.    "A parent's right to the preservation of his relationship with his child derives from the fact that the parent's achievement of a rich and rewarding life is likely to depend significantly on his ability to participate in the rearing of his children. A child's corresponding right to protection from interference in the relationship derives from the psychic importance to him of being raised by a loving, responsible, reliable adult." *Franz v. U.S.*, 707 F 2d 582, 595^Q599; US Ct App (1983).

x.    "A parent's right to the custody of his or her children is an element of "liberty" guaranteed by the 5th Amendment and the 14th Amendment of the United States Constitution." *Matter of Gentry*, 369 NW 2d 889, MI App Div (1983).

y.    "Reality of private biases and possible injury they might inflict were impermissible considerations under the Equal Protection Clause of the 14th Amendment." *Palmore v. Sidoti*, 104 S Ct 1879; 466 US 429.

z.    "Judges must maintain a high standard of judicial performance with particular

emphasis upon conducting litigation with scrupulous fairness and impartiality. 28 USCA § 2411; *Pfizer v. Lord*, 456 F.2d 532; cert denied 92 S Ct 2411; US Ct App MN, (1972).

aa. "State Judges, as well as federal, have the responsibility to respect and protect persons from violations of federal constitutional rights." *Gross v. State of Illinois*, 312 F 2d 257; (1963).

bb. The Constitution also protects "the individual interest in avoiding disclosure of personal matters." Federal Courts (and State Courts), under Griswold can protect, under the "life, liberty and pursuit of happiness" phrase of the Declaration of Independence, the right of a man to enjoy the mutual care, company, love and affection of his children, and this cannot be taken away from him without due process of law. There is a family right to privacy, which the state cannot invade or it becomes actionable for civil rights damages." *Griswold v. Connecticut*, 381 US 479, (1965).

cc. "The right of a parent not to be deprived of parental rights without a showing of fitness, abandonment or substantial neglect is so fundamental and basic as to rank among the rights contained in this Amendment (Ninth) and Utah's Constitution, Article 1 § 1." *In re U.P.*, 648 P 2d 1364; Utah, (1982).

dd. "The rights of parents to parent-child relationships are recognized and upheld." *Fantony v. Fantony*, 122 A 2d 593, (1956); Brennan v. Brennan, 454 A 2d 901, (1982).

ee. "State's power to legislate, adjudicate and administer all aspects of family law, including determinations of custodial; and visitation rights, is subject to scrutiny by federal judiciary within reach of due process and/or equal protection clauses of 14th Amendment...Fourteenth Amendment applied to states through specific rights contained in the first eight amendments of the Constitution which declares fundamental personal rights...Fourteenth Amendment encompasses and applied to states those preexisting fundamental rights recognized by the Ninth Amendment. The Ninth Amendment acknowledged the prior existence of fundamental rights with it: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." The United States Supreme Court in a long line of decisions, has recognized that matters involving marriage, procreation, and the parent-child relationship are among those fundamental "liberty" interests protected by the Constitution. Thus, the decision in *Roe v. Wade*, 410 US 113; 93 S Ct 705; 35 L Ed 2d 147, (1973), was recently described by the Supreme Court as founded on the "Constitutional underpinning of ... a recognition that the "liberty" protected by the Due Process Clause of the 14th Amendment includes not only the

freedoms explicitly mentioned in the Bill of Rights, but also a freedom of personal choice in certain matters of marriage and family life." The non-custodial divorced parent has no way to implement the constitutionally protected right to maintain a parental relationship with his child except through visitation. To acknowledge the protected status of the relationship as the majority does, and yet deny protection under Title 42 USC § 1983, to visitation, which is the exclusive means of effecting that right, is to negate the right completely." *Wise v. Bravo*, 666 F.2d 1328, (1981).

ff.  "One of the most precious rights possessed by parents is the right to raise their children free of government interference. That right, "more precious than mere property rights," is a liberty interest, protected by the substantive and procedural Due Process Clauses of the Fourteenth Amendment." *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

gg.  "Because of the magnitude of the liberty interests of parents and adult extended family members in the care and companionship of children, the Fourteenth Amendment protects these substantive due process liberty interests by prohibiting the government from depriving fit parents of custody of their children. See *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Santosky v. Kramer*, 455 U.S. 745, 760, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *Duchesne v. Sugarman*, 566 F.2d 817, 824 (2d Cir. 1977); *Hurlman v. Rice*, 927 F.2d 74, 79 (2d Cir. 1991). In the United States Supreme Court's view, the state registers "no gains toward its stated goals [of protecting children] when it separates a fit parent from the custody of his children." *Stanley*, 405 U.S. at 652.

hh.  "In controversies affecting the custody of an infant, the interest and welfare of the child is the primary and controlling question by which the court must be guided. This rule is based upon the theory that the state must perpetuate itself, and good citizenship is essential to that end. Though nature gives to parents the right to the custody of their own children, and such right is scarcely less sacred than the right to life and liberty, and is manifested in all animal life, yet among mankind the necessity for government has forced the recognition of the rule that the perpetuity of the state is the first consideration, and parental authority itself is subordinate to this supreme power. It is recognized that: 'The moment a child is born it owes allegiance to the government of the country of its birth, and is entitled to the protection of that government. And such government is obligated by its duty of protection, to consult the welfare, comfort and interest of such child in regulating its custody during the period of its minority.' *Mercein v. People*, 25 Wend. (N. Y.) 64, 103, 35 Am. Dec. 653; *McKercher v. Green*, 13 Colo. App. 271, 58 Pac. 406. But as government should never interfere with the natural rights of man, except only when it is essential for the good of society, the state recognizes, and enforces, the right

which nature gives to parents [48 Colo. 466] to the custody of their own children, and only supervenes with its sovereign power when the necessities of the case require it."

ii.   "The experience of man has demonstrated that the best development of a young life is within the sacred precincts of a home, the members of which are bound together by ties entwined through 'bone of their bone and flesh of their flesh'; that it is in such homes and under such influences that the sweetest, purest, noblest, and most attractive qualities of human nature, so essential to good citizenship, are best nurtured and grow to wholesome fruition; that, when a state is based and builded upon such homes, it is strong in patriotism, courage, and all the elements of the best civilization. Accordingly these recurring facts in the experience of man resulted in a presumption establishing prima facie that parents are in every way qualified to have the care, custody, and control of their own offspring, and that their welfare and interests are best subserved under such control. Thus, by natural law, by common law, and, likewise, the statutes of this state, the natural parents are entitled to the custody of their minor children, except when they are unsuitable persons to be entrusted with their care, control, and education, or when some exceptional circumstances appear which render such custody inimical to the best interests of the child. While the right of a parent to the custody of its infant child is therefore, in a sense, contingent, the right can never be lost or taken away so long as the parent properly nurtures, maintains, and cares for the child." *Wilson v. Mitchell,* 111 P. 21, 25-26, 48 Colo. 454 (Colo. 1910)

## COUNT ONE: FOURTEENTH AMENDMENT VIOLATION - 42 U.S.C. §1983

(Due Process, Familial Association, Right to Parent, Conspiracy, Breach of Contract, Abuse of Process, Culpable Breach of Duty, Intentional Infliction of Emotional Distress, Personal Injury)

592. The averments of the above stated paragraphs are alleged as if fully set forth herein.

593. Defendants deprived Plaintiffs of their federal substantive and procedural due process rights in the Family Court by denying them access to the court, proper legal representation, fair and full hearings and they violated Plaintiffs'

constitutional rights to due process, familial association and freedom of religion

as guaranteed by the 1st, 4th and 14th Amendments of the U.S. Constitution.

594. Defendants made, caused to be made, acted in concert or conspired to make, and/or aided and abetted one another to make representations as to material facts as alleged herein which were false, and known to be false by Defendants and were done as part of Defendants' custom and policy as they are friends who undermine court proceedings and integrity to complicate and protract cases so they can profit.

595. Acting pursuant to said custom and policy, at all relevant times alleged herein, Defendants acted in concert and with the cooperation and encouragement of each other to commence and continue fictionalized proceedings against Plaintiffs and continued the prosecution of Plaintiff RACHEL in the Family Court to the point of taking away her access entirely and/or having third parties interfere with their access time without a basis.

596. Defendants caused said prosecution of Plaintiff RACHEL by the filing of baseless motions against her, deficient and false forensic reports they used to support their baseless arguments to take away Plaintiff H.A. from his mother against her wishes, and Defendants willfully and maliciously continued to fabricate facts, reports and orders and ignore any positive report favoring Plaintiffs.

597. Defendants deprived Plaintiff H.A. of his federal rights to access his mother and his right to a fair hearing by ignoring H.A.'s desire to live with his

mother; and interfering with his wishes by controlling the court proceedings based on their personal bias and greed.

598. The Fourteenth Amendment to the United States Constitution provides Plaintiffs a right to intimate association. That guarantees an individual the choice of entering an intimate relationship free from undue intrusion by the STATE, including the fundamental liberty interest of natural parents in the care, custody, and management of their child.

599. Plaintiff RACHEL is informed and believes and thereon alleges that the right to familial association guaranteed under the Fourteenth Amendment is "clearly established" such that a reasonable judge, and attorney for the child in Defendants' situation would know it is unlawful to remove a child from the care, custody, and control of its parent or for STATE actors or private individuals working in the court system to subject a child, in the absence of proven exigent circumstances or a sound and substantial basis to change custody for years without.

600. In addition, there is a clearly established due process right not to be subjected to false accusations on the basis of false evidence that was fabricated such that a reasonable judge, attorney, and/or custody evaluator would know it is unlawful to lie, fabricate evidence, and/or suppress exculpatory evidence in court reports or filed with the court.

601. In doing the things alleged herein above, Defendants and each of them, interrupted and impaired the familial rights of Plaintiffs by unlawfully

110

removing Plaintiff H.A. from the custody and care of his mother Plaintiff
RACHEL and continuing such interference for years that resulted from a lie and
continuing lies, suppressions, subversions, and fabrications perpetuated by
Defendants.

602. In doing the things alleged herein above, Defendants and each of them,
interrupted and impaired the rights of Plaintiff RACHEL to parent her child for
years as her access was denied based on false and incomplete reports of Defendant
BASZCZUK.

603. All Defendants knowingly, intentionally, and voluntarily collaborated with the
other Defendants, and each of them in effectuating their unlawful scheme/plan to
keep Plaintiff H.A. from the care, custody, and control of his mother, and out of
his mother's home for as long as possible and continuing to date.

604. All Defendants knowingly, intentionally, and voluntarily collaborated with the
other Defendants, and each of them in effectuating their unlawful scheme/plan to
keep Plaintiffs in the middle of conflict, domestic violence, and in control by
their abuser, Defendant BRYAN ALINTOFF, for as long as possible and
continuing to date.

605. Defendants did these things without proper justification or authority as the
orders are void *ab initio* due to lack of subject matter jurisdiction and based
on uncorroborated lies by Defendants that Plaintiff RACHEL was
"alienating" Defendant BRYAN ALINTOFF from their children based
upon Richard Gardner's false theories causing Defendants to fictionalize a

111

standard of "parental alienation" to support the lie in order to establish bogus case law on Richard Gardner's unscientific Parental Alienation theories to demonize and control women, pathologize victims, marginalize protective mothers and get control of children to support the ENTERPRISES of the family court industry, child pornography industry and human trafficking.

606. All of these acts were and are done deliberately, maliciously and with willful indifference to Plaintiffs' protected rights under State and Federal laws and procedures to interfere with Plaintiffs' rights to due process.

607. Regardless of the procedures, Defendants as state actors abused their governmental decisions and actions to violate Plaintiffs' fundamental rights when no overriding important State interest justified those infringements.

608. Defendants infringed on Plaintiffs' constitutional rights to access to each other and parental rights by summarily approving orders to violate those rights on the basis of false or greatly flawed representations of each other.

609. Defendants infringed on Plaintiffs' constitutional rights to access to each other and parental rights by using judicial proceedings that were otherwise substantially tainted by Defendants by concealing the fact that Plaintiff H.A. wants to live with his mother and fictionalizing a case against his mother.

610. For over three years, Defendants deprived Plaintiffs of their substantive and procedural due process rights under the Fourteenth Amendment by repeatedly and systematically interfering with Plaintiff RACHEL's right to parent her child and Plaintiffs' rights to access each other as parent and child based upon

government action that is arbitrary, conscience-shocking and oppressive in a constitutional sense by refusing full hearings, failing, refusing and deliberately ignoring Plaintiff H.A.'s best interests including Plaintiff RACHEL's emergency motions notifying Defendants that the father abuses and endangers H.A..

611. The forgoing violations of Plaintiffs' Federal constitutional rights by the Defendants, together with their co-conspirators and accomplices, known and unknown as DOES, directly, substantially, proximately, and foreseeably caused Plaintiffs' custody case to be protracted for over three years that alienated them from each and caused them other injuries and damages as alleged herein.

612. The foregoing violations of Plaintiffs' rights were taken under color of State law and within the scope of Defendants' employment and outside of it; and Defendants committed the violations knowingly, intentionally, willfully, fraudulently, recklessly, negligently, and/or with deliberate indifference to Plaintiffs' constitutional rights or to the effect of such misconduct upon Plaintiffs' constitutional rights.

613. For over three years and continuing to date, Defendants infringed on Plaintiff RACHEL's liberty interest in maintaining the integrity of her family and to be with her child and the child's rights to associate with his mother which is so shocking, arbitrary, and egregious that the Due Process clause would not countenance it even were it accompanied by full procedural protection.

614. Defendants interrupted and impaired the familial rights of Plaintiffs by removing H.A. from his mother's custody and continued therefrom to impair their relationship with *ex parte* and other baseless orders to the point of completely denying access between the Plaintiffs.

615. In doing the things alleged herein above and the Court's failure to protect her and her child from domestic violence at the hands of Defendant BRYAN ALINTOFF, Defendants caused Plaintiff RACHEL to develop Post-Traumatic Stress Disorder (PTSD) as a result. Defendants assisted Defendant BRYAN ALINTOFF in a cyclical and ongoing tort to inflict emotional distress upon and further abuse her and their child. Defendants committed tortious acts and are therefore responsible for personal injury to Plaintiffs and liable for damages.

616. By reason of the foregoing, the Defendants are liable to Plaintiffs pursuant to 42 U.S.C. §§1983 and 1985 and for punitive damages; and pursuant to 18 U.S.C. §§1961-1968 Racketeer Influenced and Corrupt Organizations Act (RICO) and for treble damages.

## COUNT TWO: RICO VIOLATION - 18 U.S.C. §1961-1968

(Racketeering, Influence, and Corrupt Organization)

617. The averments of the above stated paragraphs are alleged as if fully set forth herein.

618. Defendants are each engaged in activities which constitute a RICO Enterprise, and each such Defendant is a "person," as that term is defined pursuant to Section

114

1961(3)-(4) and 1962(c) of the Racketeer Influenced and Corrupt Organizations Act of 1970 (RICO).

619. By virtue of their affiliations, conspiracy, associations, and collaboration as alleged herein, RICO DEFENDANTS function collectively as alter ego vehicles of one another, facilitate, and further the commercial purposes of ENTERPRISES alleged herein. Specifically, in addition to the conspiracy allegations detailed above, each Defendant is liable as a principal pursuant to 18 U.S.C. § 2(a)-(b), and that each and every RICO person that is a RICO Defendant is liable as a co-conspirator pursuant to 18 U.S.C. § 371.

620. DEFENDANTS, and each of them, while affiliated with one or more ENTERPRISES, have operated, affiliated with, and participated directly and indirectly in the conduct of ENTERPRISE affairs through a pattern of racketeering activity, in violation of 18 U.S.C. § 1964 (b), (c), and (d) as stated herein.

## RICO ENTERPRISES

621. Defendants' collusion and conspiracy, for purposes of Plaintiffs' RICO §1962(c) claims for relief, constitute an ENTERPRISE engaged in, or the activities of which affect, interstate and/or international commerce as those terms are defined pursuant to Title 18 United States Code §1961(4) of the Racketeer Influenced and Corrupt Organizations Act of 1970 ("RICO"), *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007), and *National Organization for Women v. Scheidler*, 510 U.S. 249 (1994), (collectively "RICO ENTERPRISES"), which are charged to them and are indictable offenses.

622. By reason of the foregoing, the Defendants are liable to Plaintiffs for punitive damages and treble damages pursuant to 18 U.S.C. §§1961-1968 Racketeer Influenced and Corrupt Organizations Act (RICO).

623. Defendants deliberately blocked forensics in this case by hiding Defendant BRYAN ALINTOFF's financial information from Plaintiff RACHEL, barring Plaintiffs from obtaining a prudent custody evaluation, and denying RACHEL's countless pleas for redress with the court on behalf of the child Plaintiff H.A..

624. Defendants did this to cover up a conspiracy, pattern of racketeering and RICO ENTERPRISE in order to connect, collude, conspire, and scheme to defraud the public, affecting commerce both domestically and internationally, including, but not limited to, facilitating and engaging in predatory lending practices, bribes, extortion, kickbacks, insurance fraud, insider trading, obstruction of justice, interference with accounts, computer hacking, spying, invasion of privacy, harassment, electronic stalking, and other offenses, which includes the creation, implementation, and upkeep of "special software" to achieve this goal, all of which Defendants are charged with herein and are indictable offenses.

625. All real estate properties and assets all Defendants own, either in part or whole, are and/or may have been acquired with proceeds obtained through, associated with, or invested into their RICO ENTERPRISES, through a pattern of racketeering activity, thereby rendering those properties and assets subject to this lawsuit and subject to seizure.

626. In addition to affecting commerce, Defendants actions caused bankruptcies, foreclosures, mental health issues and other traumas, thereby causing numerous personal injuries to the public at large, both domestically and internationally. This is eugenics and social engineering.

627. Defendants are engaging in a pattern of racketeering activity to harm the Plaintiffs and the public at large by subverting domestic violence and child abuse.

## RICO §1961(5) PATTERN OF RACKETEERING ACTIVITY ALLEGATIONS

## 18 U.S.C. § 1961(5)

### COMMISSION OF RICO §1961(1)(B) RACKETEERING ACTIVITY.

628. RICO DEFENDANTS engage in the following "racketeering activity," as that term is defined pursuant to 18 U.S.C. § 1961 (c) ("RACKETEERING ACTIVITY"). RICO DEFENDANTS' RACKETEERING ACTIVITY as committing, aiding and abetting, or conspiring to commit thousands of violations of the following laws within the past ten years and beyond, including:

A. Conspiracy Against Rights: 18 U.S.C. § 241

B. Deprivation of Rights Under Color of Law: 18 U.S.C. § 242

C. Federally Protected Activities: 18 U.S.C. § 245

D. Freedom of Access to Clinic Entrances (FACE) Act: 18 U.S.C. § 248

E. Fraud and related activity in connection with identification documents, authentication features, and information: 18 U.S.C. § 1028;

F. Kidnapping: 18 U.S.C. § 1201

G. Mail Fraud: 18 U.S.C. § 1341;

117

H. Wire Fraud: 18 U.S.C. § 1343;

I. Bank Fraud: 18 U.S.C. § 1344;

J. Intangible Personal Property Right Deprivation: Title 18 U.S.C. § 1346;

K. Influencing or injuring officer or juror generally: 18 U.S.C. § 1503;

L. Obstruction of proceedings before departments, agencies, and committees: 18 USC

§ 1505;

M. Obstruction of Criminal Investigations: 18 U.S.C. § 1510;

N. Tampering with a witness, victim, or an informant: 18 U.S.C. § 1512;

O. Retaliating against a witness, victim, or an informant: 18 U.S.C. § 1513;

P. Peonage; obstructing enforcement: 18 U.S.C. § 1581;

Q. Enticement into slavery; 18 U.S.C. § 1583;

R. Sale into involuntary servitude: 18 U.S.C. § 1584;

S. Seizure, detention, transportation or sale of slaves: 18 U.S.C. § 1585;

T. Service on vessels in slave trade: 18 U.S.C. § 1586;

U. Possession of slaves aboard vessel: 18 U.S.C. § 1587;

V. Forced labor: 18 U.S.C. § 1589;

W. Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor:

18 U.S.C. § 1590;

X. Unlawful conduct with respect to documents in furtherance of trafficking,

Y. peonage, slavery, involuntary servitude, or forced labor: 18 U.S.C. 1592;

Z. Benefitting financially from peonage, slavery, and trafficking in persons: 18 U.S.C.

§ 1593A;

AA. Conspiracy, attempt to commit acts of peonage, slavery, proscribed: 18 U.S.C. §
    1594;

BB. Interference with commerce by threats or violence: 18 USC § 1951;

CC. Interstate and foreign travel or transportation in aid of racketeering enterprises: 18
    U.S.C. § 1952;

DD. Violent crimes in aid of racketeering activity: 18 U.S.C. § 1959;

EE. Principal and Aider and Abettor, Attempt, Conspiracy Liability: Title 18 U.S.C. §
    2(a) and (b).

FF.  Stalking: 18 U.S.C. § 2261A

GG. Violence Against Women Act (VAWA): 42 U.S.C. § 136, subchapter III

HH. False Imprisonment and Deprivation of Rights: 42 U.S.C. § 1983

II. Conspiracy to Interfere With Civil Rights: 42 U.S.C. § 1985

JJ. Criminal Interference With Right to Fair Housing: 42 U.S.C. § 3631

**Under the Prevention of Domestic Act, Defendants have aided and abetted**

**Defendant BRYAN ALINTOFF in the following violations of New Jersey State law:**

KK.  Assault: N.J.S.A. 2C:12-1

LL.  Terroristic threats: N.J.S.A. 2C:12-3

MM. Kidnapping: N.J.S.A. 2C:13-1

NN.  Criminal restraint: N.J.S.A. 2C:13-2

OO.  False imprisonment: N.J.S.A. 2C:13-3

PP.  Criminal mischief: N.J.S.A. 2C:17-3

QQ.  Criminal trespass: N.J.S.A. 2C:18-3

RR. Harassment: N.J.S.A. 2C:33-4

SS. Stalking: N.J.S.A. 2C:12-10

## COUNT THREE: FIRST AMENDMENT VIOLATIONS - FREEDOM OF RELIGION

629. The averments of the above stated paragraphs are alleged as if fully set forth herein.

630. Pursuant to the First Amendment, Plaintiffs are guaranteed the right to pursue their religious beliefs without interference from the State actors.

631. Plaintiff RACHEL as the parent and mother of Plaintiff H.A. has the right to teach her child her religious beliefs and exercise religion with her children.

632. Plaintiff H.A. has the right to freedom of religion, to choose his religion and exercise his religious beliefs with his mother.

633. Those rights were deliberately and maliciously interfered with by Defendants supporting and promoting the father's religious beliefs on and control of H.A. to the exclusion of RACHEL's wishes, deliberately ignoring the mother's rights and joint legal custody set forth in the parents' Consent Order.

634. Defendants as STATE actors and the other Defendants abused their powers and positions in the court to ignore Plaintiffs' constitutional rights to promote Defendants' self-interests and unwarranted and unlawful beliefs, including religious, schooling and even therapeutic, upon Plaintiffs without a basis and using fictional, false and fabricated reports in collusion with each other to create a false case to support their unlawful objectives.

120

635. Defendants deliberately and maliciously interfered with Plaintiffs' rights by alienating Plaintiff H.A. from the heritage of his Jewish mother and her family.

636. Those rights were deliberately and maliciously interfered with by Defendants bias taking preference to the father by giving him abundant rights to raise H.A. to the exclusion of the mother.

637. Because of Defendants' constitutional violations, Plaintiffs lost their right to religious freedom and heritage.

638. By reason of the foregoing, the Defendants are liable to Plaintiffs pursuant to 42 U.S.C. §§1983 and 1985 and for punitive damages; and pursuant to 18 U.S.C. §§1961-1968 Racketeer Influenced and Corrupt Organizations Act (RICO) and for treble damages.

## COUNT FOUR: 42 U.S.C. §1983 – *Monell* Claims

(Defendant STATE and DOES)

639. The averments of the above stated paragraphs are alleged as if fully set forth herein.

640. The foregoing violations of Plaintiffs' Federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant STATE and DOES, amounting to deliberate indifference to the constitutional rights of persons as litigants in the Bergen County Family Court, including Plaintiffs.

641. Prior to Plaintiffs' custody case, policymaking officials at Defendant STATE and DOES, with deliberate indifference to the constitutional rights of individual litigants in Bergen County Family Court and to the risk of violating

121

their due process rights and causing irreparable harm to familial association rights and freedom of religion by protracting custody cases beyond the 180 day statutory mandate, and to the right of all litigants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

a.  ignoring heavy case loads of attorneys and encouraging such overload;

b.  refusing to control court calendars for custody cases to move expeditiously to trial on a continuous basis;

c.  failing to insure litigants a full and fair opportunity to be heard without multiple adjournments that financially and emotionally burden litigants and cause them to ultimately concede or withdraw to losing their right to a fair trial;

d.  encouraging litigants and court-appointed personnel such as forensics and attorneys to use trickery, duress, fabrication and/or false testimony and/or evidence, and failing to disclose exculpatory evidence, in preparing and presenting reports and court documents to the Court;

e.  ignoring the meaning and definition of "imminent" and the application of factual circumstances to the determination of whether or not "imminent" harm exists to a sufficient degree as would obviate the need for a full hearing before the court changes custody of the child or children from his/her/their parents or guardians as it did in this case and continued to do so in every subsequent order denying Plaintiffs access to each other;

f.  ignoring the meaning and definition of "temporary" and the application of factual circumstances to the determination of whether or not an order changing custody is "temporary";

g.  ignoring the irreparable emotional trauma and resulting symptoms for children removed and/or separated from their parents and/or primary caregivers and the likelihood of life-long emotional harm and, likewise, the emotional trauma and resulting symptoms for the parent and/or primary caregiver whose child is removed from their care and the likelihood of life-long emotional harm;

h.  ignoring whether a litigant can afford to pay third parties before ordering them with the threat of contempt to pay thousands of dollars to court appointed persons;

i.  ignoring the rights of parents to be free from malicious prosecution or false without a full plenary hearing;

j.  by acting with deliberate indifference to implement a policy of inadequate training, and/or by failing to train its officers, agents, employees and STATE actors providing the constitutional protections guaranteed to individuals, including those under the Fourteenth Amendment, when performing actions related to child custody proceedings; and

k.  by acting with deliberate indifference in implementing a policy of inadequate supervision., and/or by failing to adequately supervise its officers, agents, employees and STATE actors, in providing the constitutional protections guaranteed to individuals, including those under the Fourteenth Amendment, when performing actions related to child custody proceedings;

642. The aforesaid deliberate or *de facto* policies, procedures, regulations, practices, and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendant STATE and DOES, including but not limited to Defendants named herein who knew (or should have known):

   a. to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in custody proceedings;

   b. that such issues either present Family Court judges with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of the Family Court mishandling such situations as well as the incentives that judges have to make the wrong choice, such as forcing the case to close without due process for the incentive to clear the court's calendar; and

   c. that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of family court litigants and their children at issue and cause them constitutional injury.

643. The aforementioned policymaking officials had the knowledge and the notice of their policies creating unconstitutional interference with litigants' rights as the violations were so egregious that the public has decried the family court as alleged in paragraphs hereinabove, and alleged hereinabove that Plaintiff RACHEL complained many times to the supervising judges, entities, and

124

disciplinary bodies named herein as Defendants in and out of court so they have actual notice.

644. Despite this knowledge, the supervisory and policymaking officers and officials of Defendants STATE and DOES perpetuated, or failed to take preventative or remedial measures to terminate said policies, procedures, regulations, practices and/or customs, did not effectively instruct, train and/or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority, had no employee handbook or other published practices, policies or procedures for investigating and disciplining prosecutors who had engaged in constitutional and other violations, and did not discipline or otherwise properly supervise the individual personnel who engaged in such practices, but instead sanctioned or tolerated the policies, procedures, regulations, practices and/or customs, described above, with deliberate indifference to the effect of said policies, procedures, regulations, practices and/or customs upon the constitutional rights of residents and citizens of the STATE of New Jersey.

645. By reason of their lack of training and supervision, Defendants continue for over three years to this date to collude and conspire to unlawfully and fraudulently remove Plaintiff H.A. from his mother RACHEL and excessively interfere with their access to each other knowing there was never a fair hearing or a basis to do so, yet they consistently rely on false orders as a basis to do so.

646. The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs including the failure to properly instruct, train, supervise and/or

discipline employees with regard thereto) were implemented or tolerated by policymaking officials for Defendant STATE and DOES.

647. By virtue of the foregoing, Defendant STATE and DOES are liable to Plaintiffs because of their intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants and/or employees with regard to their aforementioned duties.

648. By virtue of the foregoing, Defendant STATE and DOES are liable for having substantially caused the foregoing violations of Plaintiffs' constitutional rights and their constitutional injuries.

649. By reason of the foregoing, the Defendants are liable to Plaintiffs pursuant to 42 U.S.C. §§1983 and 1985 and for punitive damages; and pursuant to 18 U.S.C. §§1961-1968 Racketeer Influenced and Corrupt Organizations Act (RICO) and for treble damages.

**COUNT FIVE: BREACH OF CONTRACT**

650. The averments of the above stated paragraphs are alleged as if fully set forth herein.

651. Defendant BRYAN ALINTOFF breached the Consent Order he and his wife entered into on September 28, 2011.

652. Defendant BRYAN ALINTOFF is therefore liable to Plaintiffs for damages.

**COUNT SIX: VIOLATION OF CONSENT ORDER**

653. The averments of the above stated paragraphs are alleged as if fully set forth herein.

126

654. Defendants named herein who are State actors have violated 29 CFR 18.9, which is administrative law and not subject to claims for judicial immunity.

655. Defendants are therefore liable for damages to Plaintiffs.

## COUNT SEVEN: SEDITION

656. The averments of the above stated paragraphs are alleged as if fully set forth herein.

657. Defendants have engaged in a seditious conspiracy pursuant to 18 U.S. Code § 2384

658. Defendants are liable here as there is a compelling public interest involved.

## COUNT EIGHT: UNLAWFUL SEARCH AND SEIZURE

659. The averments of the above stated paragraphs are alleged as if fully set forth herein.

660. Defendants invaded Plaintiffs' privacy and are liable to Plaintiffs for damages. The Fourth Amendment gives rise to a right of action against law officials for damages from an unlawful search and seizure.

661. The damage to Plaintiffs includes the irreparable injury of anxiety and emotional distress of being scrutinized without basis and subjected to abuse by Defendants for over three years due to false state court proceedings violating their constitutional and due process rights.

662. Defendants acted intentionally and recklessly to inflict emotional distress upon the Plaintiffs. Their conduct was unscrupulous, extreme and outrageous. Their actions in requesting and subjecting Plaintiffs to the custody evaluations were the proximate cause of Plaintiffs' emotional distress. The emotional distress suffered

by the Plaintiffs was so severe that no reasonable person could be expected to endure it.

663. As a result of the Defendants' actions, Plaintiff RACHEL developed PTSD and Legal Abuse Syndrome and Plaintiffs have required psychotherapy and medical treatment.

## COUNT NINE: LEGAL MALPRACTICE

664. The averments of the above stated paragraphs are alleged as if fully set forth herein.

665. Defendants as attorneys named herein not only violated multiple laws, ethics and other procedures as alleged herein above, but engaged in fraud, collusion, malicious acts and created other special circumstances to confuse and pervert the court proceedings for which their actions constitute legal malpractice.

666. Defendants violated RPC 3.1. Meritorious Claims and Contentions and RPC 4.4. Respect for Rights of Third Persons; as well as many other Rules of Professional Conduct.

667. Plaintiff RACHEL, as parent and legal guardian to her child H.A., has a valid legal malpractice claim against Defendant named as attorneys herein for the benefit of her child as his natural guardian and herself, as but for Defendants negligence the case would not be protracted for over three years nor gone to trial under such egregious and collusive circumstances; RACHEL and H.A. would not be so unduly segregated for over three years; H.A.'s wishes would have been represented to the court that he wants to live with his mother; H.A. would not be

subjected to the abuse of multiple third parties unnecessarily interrogating and investigating him.

668. Defendants named as attorneys herein failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession which resulted in actual damages to Plaintiff RACHEL of expending thousands of dollars to Defendants and her attorneys, which are pecuniary losses sustained and the facts alleged herein show actual damages could reasonably be inferred from the extraordinary litigation expenses incurred by motions, oppositions and appeals, among other legal expense in Plaintiff RACHEL's attempt to avoid, minimize or reduce damages to her and her child H.A. caused by the wrongful conduct of attorneys named as Defendants herein which is charged to them.

669. Defendants influenced and supported their fraudulent actions and continue to do so, constituting a pattern of racketeering and conspiracy to intentionally deprive Plaintiffs of their rights, which is charged to them and are indictable offenses.

670. Any claim to immunity and/or quasi-immunity fails as for a long time, by Defendants misconduct they stepped out of boundaries of such immunity by deliberately engaging in a "campaign of lies" for three years as alleged herein above which any reasonable attorney or citizen can understand no attorney should conduct themselves as Defendants have.

671. Any claim to immunity and/or quasi-immunity fails as by Defendant attorneys' misconduct, they stepped out of boundaries of such immunity by deliberately engaging in fraud, trickery and sabotage as alleged herein above which any

reasonable attorney or citizen can understand no attorney should conduct themselves as Defendants have.

## COUNT TEN: THERAPIST/SOCIAL WORKER MALPRACTICE AND FRAUD

(psychological abuse, intentional infliction of emotional distress, negligence, vendor misfeasance and malfeasance)

672. The averments of the above stated paragraphs are alleged as if fully set forth herein.

673. Defendants named as mental health practitioners herein have committed malpractice. Defendants failed to obtain informed consent from Plaintiff RACHEL to psychologically treat her child Plaintiff H.A..

674. These Defendants psychologically abused H.A.. Defendants engaged in vendor misfeasance and malfeasance and breached the fiduciary duty they had to child Plaintiff H.A., to perform prudent services.

675. These Defendants subverted child abuse and domestic violence.

676. They profited from intentionally harming an Autistic child who has suffered emotional, physical, developmental, and economic injuries as a result of their actions. They have intentionally and criminally endangered the welfare of a disabled minor here and the other Defendants have supported their fraudulent actions.

677. A psychotherapist, by law, owes a duty to use reasonable care in his or her treatment of a patient or client. When the psychotherapist violates that duty by either acting negligently toward the patient, intentionally harming the patient, abusing the patient or defrauding the patient, it is considered a breach of the duty of care and the

130

psychotherapist is liable to the patient for all allowable damages that the psychotherapist causes.

678. These Defendants have a strong corruptive influence on and presence in the Monmouth County Family Court system and DYFS n/k/a DCP&P, who refers business to them.

679. These Defendants colluded with Defendants numerous times, constituting a pattern of racketeering and Honest Services Fraud pursuant to 18 U.S.C. §1346 and wrongful conduct, which are charged to them and are indictable offenses.

680. These Defendants have harmed Plaintiffs and assisted Defendant BRYAN ALINTOFF in subverting H.A.'s autism, and tortious interference and intentional infliction of emotional stress upon Plaintiffs, which is charged to them.

681. Defendants influenced and supported each other's fraudulent actions and continue to do so, constituting a pattern of racketeering and conspiracy to intentionally deprive Plaintiffs of their rights, which are charged to them and are indictable offenses.

682. Plaintiff RACHEL, as parent and legal guardian to her child H.A., has valid malpractice and personal injury claims against these Defendants for the benefit of her child as his natural guardian and herself, corroborated by the facts as alleged herein.

683. Any claim to immunity and/or quasi-immunity fails as by these Defendant's willful misconduct they stepped out of boundaries of such immunity by deliberately engaging in a "campaign of lies" and denigration of Plaintiff RACHEL to her child, Plaintiff H.A., as alleged herein above and engaging in fraud, collusion, conspiracy, misfeasance, malfeasance and nonfeasance as alleged

131

herein above which any reasonable mental health practitioner or citizen can understand no mental health practitioner should conduct themselves as these Defendants have.

## COUNT ELEVEN: VENDOR MALPRACTICE AND FRAUD

684. The averments of the above stated paragraphs are alleged as if fully set forth herein.

685. Defendant BASZCZUK engaged in vendor misfeasance and malfeasance and breached the fiduciary duty she had to child Plaintiff H.A., to perform a prudent and through custody evaluation.

686. Defendant BASZCZUK committed malpractice.

687. Defendant BASZCZUK psychologically abused H.A.. Defendant engaged in vendor misfeasance and malfeasance and breached the fiduciary duty she had to child Plaintiff H.A., to perform prudent services.

688. Defendant BASZCZUK subverted child abuse and domestic violence.

689. She profited from intentionally harming an Autistic child who has suffered emotional, physical, developmental, and economic injuries as a result of their actions. She has intentionally and criminally endangered the welfare of a disabled minor here and the other Defendants have supported her fraudulent actions.

690. A custody evaluator, by law, owes a duty to use reasonable care in his or her analysis treatment of a client. When the evaluator violates that duty by either acting negligently toward the client, intentionally harming the client, abusing the client or defrauding the client, it is considered a breach of the duty of care and the

psychotherapist is liable to the client for all allowable damages that the evaluator causes.

691. Defendant BASZCZUK has a strong corruptive influence on and presence in the Monmouth County Family Court system and DYFS n/k/a DCP&P, who not only refers business to her, but also now employs her, notwithstanding numerous pending ethical complaints against her.

692. Defendant BASZCZUK is a preferred vendor of Defendant LOMURRO, who regularly refers business to her where they collude to predetermine the outcome of custody evaluations.

693. Defendants colluded numerous times, constituting a pattern of racketeering and Honest Services Fraud pursuant to 18 U.S.C. §1346 and wrongful conduct, which are charged to them and are indictable offenses.

694. These Defendants have harmed Plaintiffs and assisted Defendant BRYAN ALINTOFF in obtaining a false custody evaluation, subverting H.A.'s autism, and tortious interference and intentional infliction of emotional stress upon Plaintiffs, which is charged to them.

695. Defendants influenced and supported each other's fraudulent actions and continue to do so, constituting a pattern of racketeering and conspiracy to intentionally deprive Plaintiffs of their rights, which are charged to them and are indictable offenses.

696. Plaintiff RACHEL, as parent and legal guardian to her child H.A., has valid malpractice and personal injury claims against these Defendants for the benefit of her child as his natural guardian and herself, corroborated by the facts as alleged herein.

697. Any claim to immunity and/or quasi-immunity fails as by these Defendant's willful misconduct they stepped out of boundaries of such immunity by deliberately engaging in a "campaign of lies" and denigration of Plaintiff RACHEL to her child, Plaintiff H.A., as alleged herein above and engaging in fraud, collusion, conspiracy, misfeasance, malfeasance and nonfeasance as alleged herein above which any reasonable mental health practitioner, custody evaluator, or citizen can understand no mental health practitioner or custody evaluator should conduct themselves as these Defendant BASZCZUK has.

698. Defendant BASZCZUK has a strong corruptive influence and presence in Monmouth County Family Court. Defendants support her fraudulent actions.

699. Defendant BASZCZUK was paid and bribed by Defendants BRYAN ALINTOFF and LOMURRO to perform a biased custody evaluation in this custody litigation alone.

700. Said Defendants mailed these libelous reports more than two times constituting a pattern of racketeering, conspiracy to deprive Plaintiffs' rights, Mail Fraud, and Honest Services Fraud pursuant to 18 U.S.C. §1346, which are charged to her and are indictable offenses.

## COUNT TWELVE: UNJUST ENRICHMENT

701. The averments of the above stated paragraphs are alleged as if fully set forth herein.

702. In reliance on Defendants' acts and omissions, and as an actual and proximate result of Defendants' misconduct, nonfeasance and malfeasance described herein,

134

Defendants have been unjustly enriched in amounts paid by Plaintiff RACHEL and/or Defendant BRYAN ALINTOFF, the exact amount to proven at trial.

## COUNT THIRTEEN: DISGORGE FEES

703. The averments of the above stated paragraphs are alleged as if fully set forth herein.

704. As a result of Defendants' misconduct, nonfeasance, and malfeasance described herein, all fees paid to them must be disgorged and paid to Plaintiffs.

## COUNT FOURTEEN: DECLARATORY RELIEF & INJUNCTIVE RELIEF

705. The averments of the above stated paragraphs are alleged as if fully set forth herein.

706. The damage to Plaintiffs includes the irreparable injury of anxiety and emotional distress of being separated for over three years due to false state court proceedings violating their every constitutional and due process rights that can never be regained unless this court stays the unlawful proceedings.

707. The state court proceedings must be immediately stayed pursuant to the federal anti-injunction statute as this is a 42 U.S.C. §§1983 and 1985; and 18 U.S.C. §§1961-1968 Racketeer Influenced and Corrupt Organizations Act (RICO) suit in equity before this court, which authorizes this court to redress the deprivations and racketeering        ongoing        in        the        state        court.

## INJURIES/DAMAGES AS TO ALL COUNTS

708. Defendants have endangered the welfare of a minor child, who is also a disabled person protected under the Americans with Disabilities Act, Plaintiff H.A., pursuant to NJ Rule 2C:24-4 by their acts as alleged herein. Discovery will serve

135

to further illustrate the damage they have done to the Plaintiffs, reveal how far those acts reach to other victims who may be named as Plaintiffs after Discovery reveals their identities.

709. As a result of Defendants' actions and their deliberate indifference to Plaintiffs' constitutional rights, Plaintiff RACHEL suffered the loss of custody and access to her child, lost wages, incurred medical and legal fees and other expenses.

710. Plaintiff H.A. suffered the constitutional violations as alleged herein and loss of liberty and of the care and guidance of his parent and mother and all Plaintiffs suffered extreme humiliation, pain and suffering, terror and mental anguish, which resulted in RACHEL developing Post Traumatic Stress Disorder (PTSD), of which are irreparable damages continuing to date and beyond, and other damages as Defendants continue their violations of Plaintiffs' rights alleged herein.

711. Plaintiffs demand a temporary, preliminary and permanent injunction against all Defendants, disgorgement of fees ordered against Defendants, declaratory relief and damages to wit:

**WHEREFORE,** Plaintiffs pray for following relief, jointly and severally, against Defendants:

a. That the aforesaid conduct of Defendants be adjudged and declared to have been in violation of Plaintiffs' constitutional rights;

b. That the aforesaid conduct of Defendants be adjudged and declared to have been in violation of the common law and statutes of The United States of America;

c.   That the aforesaid conduct of Defendants as alleged against each of them herein be adjudged and declared to have been that of conspiracy, racketeering, influence, and corruption under the RICO Act;

d.   That the aforesaid conduct of Defendants as alleged against each of them herein be adjudged and declared to have been fraudulent;

e.   That the proceedings before the Monmouth County Court are adjudged and declared to have been void *ab initio* for fraud;

f.   That Defendant BRYAN ALINTOFF is adjudged and declared to be in Breach of Contract pursuant to the Consent Order between BRYAN ALINTOFF and RACHEL ALINTOFF dated September 28, 2011;

g.   That the proceedings before the Monmouth County Court are adjudged and declared to have been in violation of the Consent Order between BRYAN ALINTOFF and RACHEL ALINTOFF dated September 28, 2011 and void pursuant to 29 CFR 18.9.;

h.   Compelling the performance of the Consent Order dated September 28, 2011;

i.   Striking down State law on custody modification of a consent order minus exigent circumstances;

j.   That all State actors named as Defendants herein that violated 29 CFR 18.9 are liable to the Plaintiffs;

k.   That the aforesaid conduct of Defendants as alleged against each of them herein be adjudged and declared to have been tortious in inflicting intentional, prolonged, and irreparable emotional distress upon Plaintiffs;

l.   Granting an order to bring Plaintiff H.A. before this court to be heard;

m.    Granting an immediate order that the Defendants advance Plaintiffs the sum of 100,000 U.S. DOLLARS to secure legal representation;

n.    Granting an injunction against Defendants from continuing their unconstitutional conduct;

o.    Granting an injunction against the State actors as named herein as Defendants from any further involvement and/or influence with Plaintiffs' family;

p.    Granting an injunction against Defendants to temporarily seize all Defendants' assets and prevent the transfer of potentially forfeitable property;

q.    Granting an injunction against Defendants requiring them to put up a performance bond of 100 MILLION U.S. DOLLARS;

r.    That Defendants are adjudged and declared to have purposely subverted domestic violence and child abuse;

s.    Awarding Plaintiffs compensatory damage of not less than 100 MILLION U.S. DOLLARS;

t.    Awarding Plaintiffs punitive damages of not less than 100 MILLION U.S. DOLLARS to punish Defendants and deter them from future misconduct;

u.    Awarding Plaintiffs treble damages pursuant to the Federal RICO Act;

v.    Awarding Plaintiffs interest on all causes of action from the date Defendant BRYAN ALINTOFF filed his petition for custody in the Monmouth County Family Court because since that date Plaintiff RACHEL has never received a fair hearing and was abused in the process for over three years;

w.    Awarding attorney's fees, costs and disbursements accrued in pursuit of this action under 42 U.S.C. §1988 and CPLR Article 86;

x. A declaratory judgment that Defendant STATE's failure to oversee the Monmouth County Family Court has created a severe and unacceptably high rate of custody cases protracted beyond the statutory 180 days which deprives litigants of due process and harms them and their children by the irreparable effects of being separated and without a decision for an undue length of time;

y. A declaratory judgment that the STATE shall provide free full transcripts to any and all family court litigants upon application where child custody is an issue;

z. A declaratory judgment that State Courts involvement in family matters is unconstitutional minus exigent circumstances;

aa. A declaratory judgment that a court cannot interfere with a parent's and child's reciprocal rights to familial association;

bb. A declaratory judgment that STATE family court judges, attorneys, child custody evaluators, guardians ad litem, and parenting coordinators are mandated to report attendance and/or involvement in any and all business and/or other interests, activities, and events where they consort with one another and that the transparency of this information is to be made freely available to the public;

cc. A declaratory judgment that STATE Legal Aid and legal representation in family court must be provided on a reasonable sliding scale by all attorneys practicing in the STATE and that flat fees are imposed on any and all family court litigation, including legal fees, evaluators, guardians ad litem, and parenting coordinators; and full upfront disclosure of what family court litigation will cost to litigants - financially, emotionally, and privately; and if violated, attorneys face disbarment via a one-strike-you're-out policy. No

waiver and/or release for such shall be lawful nor new "creations" of titles and occupations to circumvent this rule;

dd.   A declaratory judgment that an extensive family court overhaul commence though an agency by the people, for the people to assess and implement new family law rules in the STATE;

ee.   A declaratory judgment that a domestic violence expert analysis is done and is the first factor considered before any custody litigation proceeds, especially if parental alienation is claimed;

ff.   A declaratory judgment that the absence of a Final Restraining Order does not negate the existence of domestic violence; and that parties must be aware of what constitutes domestic violence;

gg.   A declaratory judgment that reporting to child protective services, regardless of the outcome, cannot be used against the reporting party;

hh.   A declaratory judgment that full explanations are required by STATE courts on all decisions;

ii.   A declaratory judgment that an attorney for the child(ren) must be appointed automatically whenever custody and/or child support is of issue;

jj.   That DYFS n/k/a DCP&P is adjudged and declared to have been in violation of parents' and children's rights and is hereby disbanded and replaced with a new agency to actually protect children;

kk.   Granting Plaintiffs all legal fees and costs; and

ll.   Such other, further and different relief as the Court may deem just and proper.

January 26, 2015

Date

Rachel B. Alintoff

Rachel Alintoff, for herself and as
the parent, natural guardian and next
friend on behalf of her child, H.A.,
and All Others Similarly Situated

Plaintiffs

Mailing address:

530 East 22nd Street
Apt. 3A
Brooklyn, NY 11226
917-673-8452
rbatyas@aol.com